UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                              Chapter 15
                                                    Case No. 14-15408-RAM
Petroforte Brasileiro de Petroleo Ltda.

Debtor in a Foreign Proceeding          +-------------------------+
                                        |      UNDER SEAL         |
                                        +-------------------------+
_____/

## RESPONSE IN OPPOSITION TO MOTION FOR RELIEF FROM SEAL ORDERS AND GAG PROVISIONS, FOR LIMITED UNSEALING OF RECORD, AND TO STAY

Dr. Afonso Henrique Alves Braga of São Paulo, Brazil, as Trustee ("Trustee") of Petroforte Brasileiro de Petroleo Ltda. ("Petroforte" or the "Debtor"), opposes the relief sought in the Motion for Relief from Seal Orders and Gag Provisions, for Limited Unsealing of Record and to Stay (the "Motion"), filed by Carlton Fields Jordan Burt, P.A. ("CFJB").[1] In the Motion, CFJB seeks relief from this Court's Order Granting Motion of Trustee for Order Permitting Issuance of Subpoenas and Filings Under Seal and Related Relief, dated June 11, 2014, DE15 &16, which CFJB claims contends prohibit the subpoena targets Geofinance Limited ("Geofinance") and 1st BridgeHouse Asset Management, LLC ("BridgeHouse") (collectively, "Subpoena Targets") from disclosing the subpoenas their content or the discovery sought therein to anyone but their counsel. CFJB raises several arguments in support thereof, each of which, as demonstrated more fully below, lack merit.

---

[1]     It is unclear if the Motion was filed solely by CFJB or by the Subpoena Targets, clients of CFJB. The Trustee and the Court initially perceived the Motion was filed by the Subpoena Targets; however, it appears that CFJB claims the Motion is filed by CFJB in proper person. Given CFJB's apparent position, it is now unclear if the Subpoena Targets consented to the filing of the Motion or are even aware that the Motion was filed.

## FACTUAL BACKGROUND

The Petroforte bankruptcy dates back to its liquidation in 2003 (though proceedings date back to 2001). This action, commenced by the Trustee's Verified Petition for Recognition of Foreign Main Proceeding Pursuant to §§ 1515 and 1517 ("Petition"), which this Court granted (the "Chapter 15 Case" or the "Recognition Order") is the second proceeding in South Florida in which the Trustee and CFJB have appeared. Though related to the same bankruptcy, the two proceedings are different and the Petroforte bankruptcy has progressed since then.

### A.    The 1782 Proceedings

As described by the Trustee at length in his Petition, and similarly described by CFJB in its Motion, Motion at 4-5, the Trustee filed a proceeding in the United States District Court for the Southern District of Florida on November 3, 2010 under 28 U.S.C. § 1782. In re Petroforte, Case No. 10-MC-23973-JLK (the "1782 Proceeding").[2]  Discovery was sought against various targets including, *inter alia*, CFJB itself, seeking information about the corporate structure of Securinvest Holdings, S.A. ("Securinvest"), which CFJB served as counsel in forming, for use in the foreign bankruptcy. Though CFJB as witness was represented by another firm, CFJB acted as counsel of record for a number of parties who intervened in the proceedings, including, among others, Rural International Bank, ltd., Banco Rural, S.A., Rural Leasing, S.A., Katia Rabello ("Ms. Rabello"), Securinvest, Arnage Holdings Limited ("Arnage"), and Brooklands Holdings Limited ("Brooklands").

---

[2]    Citations to filings made in the 1782 Proceedings will be set forth as follows, "1782 Case, DEXX" though, in most instances, for the convenience of the Court, those documents are being filed in this case as exhibits hereto.

The 1782 Proceeding was extensively litigated, the primary focus of which related to the ownership structure and interests in a number of companies and economic groups. In particular, certain representations made to a court in Brazil as to the ownership of Securinvest and the extent of the extension of the Petroforte Bankruptcy to, *inter alia*, the Rural Group[3] and Ms. Rabello. The court in the 1782 Proceeding entered, among others, orders Granting in Part and Denying in Part Applicant's Motions to Compel, <u>id.</u> at DE111, and an Amended (Clarified) Order Granting in Part Intervenors' Motion to Stay Discovery Pending Resolution of Foreign Proceedings. <u>Id.</u> at DE131. As the Trustee stated in significant detail in his Petition, and contrary to CFJB's implication of the "useful[ness]" of orders to this case, Motion at 4, "[t]he court in that case made a number of findings that since have been superseded by orders or otherwise in the Petroforte Bankruptcy in Brazil." DE 2:4.[4] The case was closed once discovery was concluded. <u>Id.</u> at DE148 (**Exhibit G**).

**B.    The Brazilian Proceedings**

***The Petroforte Bankruptcy.*** During the course of 2003, the 18th Civil Circuit Court in São Paulo ("Brazilian Bankruptcy Court") issued an order placing Petroforte into a court-supervised bankruptcy, and also appointed the Trustee, Dr. Braga, as Judicial Administrator of

---

[3]    While not specifically defined the "Rural Group," includes, among others, Rural International, Banco Rural S.A.; Rural Leasing S.A. Arrendamento Mercantil; Rural International, Inc.; Rural Securities, Inc.; Banco Rural Europa S.A. (Madeira Portugal); Trade Link Investments, Inc.; Katia Rabello; Ms. Rabello's late father and Banco Rural founder Sabino Correa Rabello and her late sister Junha Rabello; Securinvest Holdings, S.A.; Arnage Holdings Limited; and Brooklands Holdings Limited.

[4]    CFJB's implicit accusation, where it "hopefully presume[s]" that counsel complied with their ethical obligation as to disclosure of the status of the Brazilian bankruptcy proceedings in the motion to seal and for non-disclosure, Motion at 5 n.1, is demonstrably false. The Petition and its attachments , all of which are of public record, show that the Trustee made full disclosure of the proceedings in Brazil. That CFJB or its "other clients" may differently characterize those proceedings, does not change the adequacy of the disclosure. Moreover, as set forth more fully below, that CFJB's "other clients" have meritless appeals pending is irrelevant.

Petroforte.   DE 2, Ex. A. During the course of the Petroforte Bankruptcy, the Brazilian Bankruptcy Court extended the Petroforte Bankruptcy to cover approximately 278 companies and 71 individuals found to be related or associated with Petroforte or the underlying wrongful acts related thereto ("Related Entities").   DE 2 ¶8; DE 2, Ex. D.   Amongst those "Related Entities," are Ms. Rabello, Securinvest, and a number of entities related to them. DE 2 ¶8; DE 2, Ex. D.

Contrary to CFJB's contention that pending appeals in Brazil are relevant, Motion at 5-6, no such appeals exist.  In fact, CFJB has not produced any evidence of or identified any pending appeal that would be relevant.  The only pending appeals are applications for leave to file extraordinary appeals to the highest courts of Brazil which applications do not create a stay, do not affect the status of the bankruptcy court proceedings in Brazil, and are highly unlikely to be successful.

***Extension Orders as to Securinvest, Turvo and Agroindustrial, as well as other related Rural Group entities and Related Appeals***.  The Brazilian Bankruptcy Court, in August 2007, entered an order extending the Petroforte Bankruptcy to (a) Securinvest (b) Turvo Participaces Ltda, and (c) Agroindustrial Espirito Santo Do Turvo Ltda, thereby making them a bankrupt party in those proceedings.  In its order, the court found that "there is strong evidence that the lease back transaction [of Sobar] was simulated and involved Rural Leasing S.A. Arrendamento Mercantil and the company Sobar S.A. Alcool e Derivados – and the credit was given to Securinvest, and Banco Rural obtained the ownership [of] the Plant for an insignificant amount," thus evidencing a fraud on Petroforte.  Consistent therewith, the court held that "the disregard of a corporate veil of all affiliated companies is suitable and the Bankruptcy of Grupo Petroforte shall be extended to them due to the property deviation and undercapitalization which the

4

financial group performed with the accomplice Mr. Ari Natalino including the management of Grupo Rural, since according to the Civil Code and Consumer Code the personal property of the defrauders is liable for the company's debt." 1782 case, DE69-3:14 **(Exhibit D)**.

Securinvest appealed this extension order to the Tribunal de Justiça São Paulo ("TJSP"), which affirmed, finding, among other things, "that the appellant [Securinvest] failed to conceal the more than obvious link of [a] fraudulent nature between The Company and the Economic Group of Petroforte and Banco Rural." 1782 case, DE69-2:29 **(Exhibit C)**. Securinvest then appealed to the Superior Tribunal of Justice ("STJ"),[5] initially requesting a stay, which was granted, but required Securinvest to produce "documents which specifically demonstrate who [Securinvest's] shareholders are, and if any of these are legal entities, who the respective shareholders are, who the shareholders of the shareholders are, and so on. This must be done in such a way that the corporate chain is unraveled and all of the individuals with a direct or indirect share in the company's [referring to Securinvest's] capital are revealed."[6] 1782 case, DE1-3:63, DE27-4:2 **(Exhibits A & B)**.

An elaborate scheme by Securinvest and related parties thereafter ensued to cover up that the ultimate beneficial owner of Securinvest was Katia Rabello. The ruse was uncovered

---

[5]    The STJ, the highest appellate court in Brazil for non-constitutional questions of federal law, is a court of limited jurisdiction. It is not authorized to review or reconsider factual findings of any kind, but rather, has jurisdiction only if one of the following three bases are shown: (i) that there exists a conflict in the judicial interpretation of a federal statute between two or more State Courts of Appeal, (ii) that the case gives rise to an issue of federal law, or (iii) there is a public interest point to review. None of these bases exist here.

[6]    There was a dispute in the 1782 Proceedings as to the translation of this request, with CFJB's "other clients" contending a proper translation was as follows: "documents that show who they are, precisely, [Securinvest's] partners and in the case of legal entities, who are its respective partners, partners of the partners and so forth, so that we may clear up the corporate chain up to and including all natural persons who have a direct or indirect share in the capital stock of the company." 1782 Case, DE27-4:5 **(Exhibit B)**. It is a distinction without a difference.

Astigarraga Davis Mullins & Grossman, P.A.

through discovery in several offshore jurisdiction, including through the 1782 Proceeding in the United States. When the true facts became known, *i.e.*, that Ms. Rabello, not the individuals identified to the STJ by Securinvest, was the beneficial owner of Securinvest, the Brazilian Bankruptcy Court entered an order holding that Securinvest's conduct in asserting facts to the STJ known to be untrue and in restructuring the ownership of Securinvest to deceive the STJ after the fact clearly constituted litigation in bad faith. As the court held, in fraudulently manufacturing the shareholder composition of Securinvest, it "gambled its defense against an incontrovertible fact, distorting the documented truth after the Court Order was made by creating [illegible] shareholder composition in order to make believe that there was no connection between the Rural Group and the Petroforte Group, something which was manifestly unfounded, invented, and deceitful." DE 2, Ex. D. The court ordered that the corporate forms of a number of entities be disregarded as a result of their connection with the Petroforte Group, the freezing of assets, the sequestration of shares, and other relief. Id.

As to the merits of the appeal, the STJ, the jurisdiction of which is limited to the review of legal issues as opposed to factual findings by the lower courts, affirmed the extension of the Petroforte bankruptcy to Securinvest and its assets, finding that the "extension of a bankruptcy and piercing of the corporate veil through which, in fraud cases, third parties are forced to respond with its own assets for the debt of the bankrupt company" was acceptable. Maira Magro, Valor, STJ declares Petroforte Bankruptcy, August 24, 2011(summarizing S.T.J. Reg. No.2010/0134557-7, Relatora: Nancy Andrighi, 09.08.2011, p.13). See **Exhibits K & L**.

The STJ also explained the reason for the extension of the bankruptcy to Securinvest and other Rural related entities. Summarizing the Trustee's argument in those proceedings, the Court stated: "The reason for extending the effects of the bankruptcy of Petroforte was that all these

companies and individuals had participated in various operations which intent was to embezzle assets from the bankruptcy estate. Specially, in regard to Securinvest, the Liquidator/Judicial Administrator states that on 22nd August 2000, Securinvest, together with Rural Leasing Arrendamento Mercantil and Sobar S/A Álcool e Derivados, actively participated in corporate operations intended to embezzle a valuable alcohol and sugar plant, amongst other assest." The STJ also confirmed that "The aforesaid legal provision were not even taken into account in the special appeal, leaving the appellant's allegations of violation of its rights in the air. In any event, not only in relation to the agroindustrial complex SOBAR, but also in relation to the other assets, the corporate chain described herein shows the existence of a *modus operandi* that confirms the influence of a group of companies (SECUTINVEST GROUP, whether or not is part of the Rural GROUP over the other (PETROFORTE)." The STJ also lifted the previously imposed stay.

Next, Securinvest filed an application for leave to appeal the STJ Order first with the STJ and then with the Supreme Federal Court of Brazil ("STF"), the highest constitutional appellate court in Brazil, both of which were denied.

The saga of Securinvest's appeals was not concluded even then. Securinvest then filed an appeal with the Chamber of Ministers of the STF (Supreme Court of Brazil), which was unanimously denied, after which Securinvest filed a motion for clarification, which also was denied. Securinvest filed an appeal challenging the decision of the STF Chamber based on an alleged different decision reached in a similar case by that Chamber, which also was dismissed. Most recently, Securinvest filed an internal appeal with the STF challenging its procedural rules, which was dismissed on August 1, 2014, and of which Securinvest sought clarification on August 22, 2014.

Securinvest thus is considered bankrupted in the Petroforte bankruptcy.[7]

Turvo, and Agroindustrial also appealed to the TJSP, both of which were rejected.  The court rejected Agroindustrial's appeal, holding that "[t]he trial judge had sufficient evidence on which to base his decision, as the appellant did not produce any evidence capable of disproving the claims of embezzlement of the assets of Sobar, frankly to benefit the economic group of Petroforte and Banco Rural and defraud creditors. "  1782 Case, DE78-1:41 (**Exhibit F**). Referring to Securinvest's appeal, the court re-affirmed that, "[a]s has already been ascertained in other appeal in relation to the same bankruptcy proceedings, there was an extensive chain of successive businesses, which under various aspects have proved to be dubious, involving deals with credit owed by the bankrupt group when there were already clear signs of the economic ruin of the debtors" and that the appellant "did not manage to eliminate the glaringly evident fraudulent connection between the company [referring to Agroindustrial] and the economic group of Petroforte and Banco Rural." Id.

In the Turvo appeal, which was similarly rejected, the same court stated that "we have sufficient evidence of the fraudulent nature of the association that existed among the appellate company [referring to Turvo] and Petroforte's and Banco Rural's financial group; it is hereby correctly resolved that the decision shall be sustained." 1782 case, DE78-1:71 (**Exhibit F**) (emphasis added).

---

[7]    CFJB's attempt to smear the Trustee by stating that his intentions may be "more complex" due to fee agreements with a Brazilian entity known as OAR Consultants LTD. and *Martin Kenney & Co., Solicitors ("MKS")*, due to purported pressure to recover assets outside Brazil, Motion at 11 n. 5, is baseless.  The Trustee hired the services of OAR and MKS to conduct international investigations and recover assets of the Estate in Brazil and abroad, in exchange for a contingency fee commensurate with contingency fees in the United States, 20% and 30%.  And, what is more, this agreement was approved by the Judicial Administrator, Office of Public Attorneys, and the Brazilian Bankruptcy Court in 2010 and affirmed unanimously by the TJSP in April 2013.

*Extension Orders as to Ms. Rabello*.  The Brazilian Bankruptcy Court entered an order extending the bankruptcy to Ms. Rabello on 28 October 2010.[8]  By this judgment, all of her assets, as well of those of the Rural Group Attorney Flavio Amaral, were placed into bankruptcy and made a part of the Petroforte estate. 1782 Case, DE75-4:2 **(Exhibit E)**.  In finding that these entities were liable for the debts of Petroforte, the Court found, *inter alia*, that: "Flávio Amaral[, who admitted that he represented Rural,] appears as the beneficiary or intermediary of off-shore companies that were shareholders in AGROINDUSTRIAL, COPASTER AND MAXICHAMA [the latter two of which were assets of Petroforte transferred to offshore companies by Ari Natalino and Rural]– see document at page 326 – all of which have been wound up, as well as the others revealed by the trustee." Id.

Ms. Rabello filed an interlocutory appeal against that order to the TJSP, which affirmed the order on September 27, 2011. Ms. Rabello filed a motion for clarification that was denied, and then filed applications for leave to bring Special and Extraordinary Appeals to the STJ, which was denied. Ms. Rabello then filed a direct application for leave to bring an Extraordinary Appeal to the STF, which is still pending.  Significantly, there is no suspension or stay of the extension order pending resolution of this application so all assets of Ms. Rabello are currently

---

[8]        Ms. Rabello was removed as president of Rural Bank.  She was involved in the "Mensalão" scandal in Brazil, relating to a vote-purchasing scheme, one of the biggest political corruption cases in Brazilian history.  In November 2012, Ms. Rabello was sentenced to nearly 17 years in prison for her purported involvement in conspiracy, money laundering, fraudulent management and illegal remittance of funds abroad.  It had been discovered by the criminal authorities that she was involved in the case based on a number of fraudulent loans intended to be used as bribes for certain members of the Brazilian congress between 2003 and 2005 that were channeled from Banco Rural through Trade Link Bank.  Ms. Rabello filed a number of unsuccessful appeals and there are still others pending, though she is now in prison.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

included in the Petroforte Bankruptcy. The Trustee believes that Ms. Rabello has very low chances of success.[9]

**The Settlement Agreement between Ms. Rabello, Securinvest, and other Parties is Invalid in the Petroforte Bankruptcy before the Brazilian Bankruptcy Court.** On October 20, 2011, the Brazilian Bankruptcy Court, then presided over by Judge Beethoven, approved a settlement offer made by, among others, Securinvest and Agroindustrial under which all parties to the agreement would be released of all liability to the Estate upon the payment to the Estate of R$210,000.000 pertaining to the sale of Sobar.[10] The agreement required that, as a condition to obtaining these funds, the Estate would cease all proceedings against and investigations pertaining to the Rural Group, including Ms. Rabello, the bankruptcy extension orders entered against Securinvest, Ms. Rabello and other companies and individuals be revoked, and all documentation uncovered in Brazil and abroad pertaining to the entities and individuals be

---

[9]    Ms. Rabello's appeal to the TJSP and applications to the STJ and STF are sealed in Brazil, such that a non-party is prevented from accessing the relevant files and orders entered therein are confidential. However, the fact of the existence of the appeal and applications is not confidential. As published by the press, describing Ms. Rabello as the "Rural Group's heiress and controlling shareholder," the TJSP's decision affirming the bankruptcy of Ms. Rabello stated that "the records show that the appellant (Katia Rabello) is named in several documents, authenticity and truthfulness of which were not seriously contested, as owner and controller of the offshore companies Arnage Holdings Limited and Brooklands Holdings Limited, which are part of the corporate base of Securinvest Holdings that was reached by Petroforte's bankruptcy," and that "it was 'impossible to deny the close subordinate-controller relationship between the appellant and Securinvest Holdings, an institution which was used to de-capitalize the bankrupt company.'" See Cristina Prestes, *TJ[SP] denies appeal of Rural's controlling shareholder*, Valor Econômico, November 3, 2011 (this publication is a prestigious financial newspaper in São Paulo).

[10]    Even if the amount due by these entities were limited to the debt due by them, with interest, R$979,982,465.67, as of currency exchange rate on 9/14/14, or US$419,030,633.90, and liability were limited to Sobar (for which a credit of approximately R$200,000,000, or US$8,4189,262.00 would be given in light of the fact that the Sobar plant is already part of the Estate), the settlement was for an amount significantly lower than this, R$210,000,000 million, or US$89,793,885.30, using same conversion date.

returned, among other things. Significantly, the proposal was opposed by the Trustee and the Public Attorney who supervised the bankruptcy proceedings, contending, among other things, that the Sobar plant had already been seized by the Estate.

The Estate filed an interlocutory appeal of the approval of the settlement order with the TJSP, which initially granted a stay of the order pending appeal (Judge Akel). On the merits, the TSPJ reversed the approval of the settlement by a vote of 2 to 1 in February 2013, with Judge Akel dissenting. The majority found that the agreement should be rejected because "the effects of the bankruptcy of Petroforte were extended [to the settling parties] as the result of the recognition of the simulation of the sale of" Sobar, that, as a result thereof, "that asset was seized and added to the bankruptcy estate under the custody of the" Trustee prior to the settlement, and that the simple return of Sobar to the estate "would not be sufficient to exclude the companies that proposed the bankruptcy agreement," which did not even have the right to dispose of the plant after the extension. T.J.S.P. Ap. No. 2013.0000063181, Relator: Luiz Antonio de Godoy, 02.05.2013, p.4. **(Exhibit H)**. The court further found that rejection was required because the settlement did not account for lost profits during the period that the settling parties were in control of the plant, from 2001 through the present, and that exclusion of these companies from the bankruptcy would contravene the goal of maximizing returns to creditors of the Estate. T.J.S.P. Ap. No. 2013.0000063181, Relator: Luiz Antonio de Godoy, 02.05.2013, p.2. **(Exhibit H)**. Securinvest and other appellees sought clarification of the decision, which was denied on April 22, 2013.

Due to the non-unanimous nature of the initial decision, Securinvest requested rehearing by a panel of five TJSP judges. The five-judge panel of the TJSP, on March 18, 2014, voted unanimously to affirm. The court pointed out, in the abstract, that parties affected by extension

orders must have limited liability over their assets and not be required to satisfy all liabilities of the estate since the purpose of such extension is to recover assets unlawfully diverted from the Estate and that, if repaid, "in principle, [this] ceases the effects of the extension of the bankruptcy to such individuals and companies, which can be excluded from the case." T.J.S.P. Ap. No.2014.0000152999, Relatora: Christine Santini, 03.18.2014, p.14. **(Exhibit I).** The court further found that, while in this case, this would theoretically apply to the Sobar plant since it was the basis of the extension, in fact, the situation before the court was not that simple. T.J.S.P. Ap. No.2014.0000152999, Relatora: Christine Santini, 03.18.2014, p.15. **(Exhibit I).** Adopting arguments made by the Trustee, the court emphasized that the fraud related to the Sobar plant involved a multitude of offshore companies, Banco Rural was the owner, directly or indirectly of some of these companies, at least one of which was being manages and in the possession of Banco Rural, and, at the time of the Sobar fraud, three companies of the Petroforte group were given as guarantee to the Rural Group. T.J.S.P. Ap. No.2014.0000152999, Relatora: Christine Santini, 03.18.2014, p.15-16. **(Exhibit I).** Based on such points, and others made by the public prosecutor, the court concluded that there was "effective interaction between Rural, Petroforte and Securinvest, showing the ownership interest of the deceased owner of Petroforte and perpetrator of the fraud in Turvo (a Petroforte Company)" through an offshore company and that Turvo had a shareholding interest in Securinvest, *i.e.*, tying together the Petroforte and Rural Groups. T.J.S.P. Ap. No.2014.0000152999, Relatora: Christine Santini, 03.18.2014, p.17. **(Exhibit I).** Based on the foregoing, the court stated that "[t]here was no mere illegal transfer of one asset, the Sobar plant, which authorizes it to be returned with the exclusion of the appellants in the bankruptcy." T.J.S.P. Ap. No.2014.0000152999, Relatora: Christine Santini, 03.18.2014, p.17. **(Exhibit I).** The Court summarized its opinion, stating that the majority opinion would be

affirmed, "not shutting down the investigative procedures in Brazil and abroad in order to search for assets that can cover the debts of the Estate, considering the corporate web originated in the transaction with Sobar, and in order to better define the effective asset liability of the appellants on the bankruptcy of Petroforte, consider[ing] the solid evidence that the diversion was not limited to the transfer of the ethanol plant."   T.J.S.P. Ap. No.2014.0000152999, Relatora: Christine Santini, 03.18.2014, p.18. **(Exhibit I).**

Kiaparack filed a motion for clarification and the TJSP issued a strong opinion, on June 10, 2014, rejection the motion.   In its decision, the court described the motion as seeking "nothing other than the complete review of the judgment, which is totally inapplicable and the arguments that the motion for clarification would have to be accepted in order to recognize the 'possibility of ratification of the agreement for exclusion of the extended bankruptcy and restrictive response to assets' is blighted with bad faith."   T.J.S.P. Ap. No.2014.0000355300, Relatora: Christine Santini, 07.10.2014, p.5-6. **(Exhibit J).**   The court went on to reject the argument that limitation of liability applied to this case by stating that, while "[i]t is true that the decision in question recognized, in theory, this possibility[,] [] it was also true that in the specific case, the effective property liability in the bankruptcy of Petroforte should, in the exact terms of the position adopted by the learned majority, be better defined after measures that clarify the corporate maze that was established in the operation that involved the Sobar Plant." T.J.S.P. Ap. No.2014.0000355300, Relatora: Christine Santini, 07.10.2014, p.6. **(Exhibit J).**

While applications for leave to pursue Special and Extraordinary Appeals to the STJ and STF have been filed and are still pending, as is evident from the foregoing, the order is unlikely to fall within such limited jurisdiction.

*The Bankruptcy Court Granted the Trustee's Request to Commence this Case.*    On June 25, 2013, the Trustee requested leave from the Brazilian Bankruptcy Court to file this Chapter 15 Proceeding.  DE 2, Ex. C.  In support thereof, the Trustee argued that due to various Brazilian decisions "declaring the extension to many companies, and decisions piercing the corporate veil of the companies affected by the extension," the Trustee had the legal duty to identify and collect assets of individual's liable for Petroforte's debts, including assets located abroad.  DE 2, Ex. C, p.1-2.  Among the entities specifically mentioned in that motion are Securinvest, Arnage, Brooklands and First Bridgehouse Fund Administration, LLC.  Id. at 3. The court granted that motion, holding that she accepted the arguments made by the Trustee and, with the consent of the Public Prosecutor, authorized "the opening of the bankruptcy proceeding in the USA."  DE 2, Ex. B.

## C.    The Chapter 15 Case

The Trustee filed the Petition for recognition on March 7, 2014.  The Trustee explained that the Petroforte Bankruptcy also involved approximately 278 companies and 71 individuals, specifically naming Securinvest Holdings S.A., Agrícola Rio do Turvo Ltda., Katia Rabello, Kiaparack Participações e Serviços Ltda., and Turvo Participações S.A., among others, as comprising the "Related Parties," and explained, at some length, both the 1782 Proceedings and the Brazilian appeals on various issues.  DE 2 ¶ 8.  The Trustee further indicated that, if granted recognition, it intended to continue its investigative efforts as to assets of Petroforte and Related Entitles that are in the U.S. and were transferred into or through the U.S., as well as transactions with persons or entities located in the U.S.  DE 2, ¶ 16.

The Court granted Recognition to the Petroforte Bankruptcy and granted related relief, attaching a listing of the "Related Parties."  DE 7.  Among other things, the Court held that "[t]he

14

relief granted hereby is necessary and appropriate, in the interests of public and international comity, consistent with the public policy of the United States, warranted pursuant to the applicable provisions of the Bankruptcy Code, and will not cause any hardship to the creditors of Petroforte or other parties in interest that is not outweighed by the benefits of the relief being granted." DE7 ¶ L. Consistent with the foregoing, the Court held, as relevant hereto, that the Trustee is authorized to examine witnesses, take evidence or seek the delivery of information concerning the assets, affairs, rights, obligations or liabilities of Petroforte and the Related Parties without further order of this Court." DE 7 ¶ 9.

The Trustee thereafter filed a Motion for Order Permitting Issuance of Subpoenas and Filings Under Seal and Related Relief and a Notice of filing Request to File Documents Under Seal. DE 10 (under seal), DE13 (under seal), DE14. The Court allowed the motion to be filed under seal and remain under seal for 180 days. DE15. This Court also granted the Motion for Issuance of Subpoenas and Filings under Seal and Related Relief, permitting the trustees to issue subpoenas under seal, allowing related filings to be filed under seal, requiring that the recipients of the subpoenas and related document "shall maintain the confidentiality of the fact and content of the Trustee's discovery efforts, except as necessary for such persons to seek advice of counsel, who are similarly restrained," and that the Motion to Seal and Gag and accompanying documents shall be treated as confidential. DE15.

CFJB filed the Motion that is the subject hereof on August 28, 2014. DE 22.[11] CFJB sets forth eight different alleged bases for granting the relief it seeks in the Motion. The "Introduction" to CFJB's Motion, however, is instructive as to the true basis for the Motion, *i.e.,*

---

[11]    This Court entered an order the next day staying response to the discovery as to the two Subpoena Targets represented by CFJB, setting a hearing on that motion for October 16, 2014, and a briefing schedule requiring the Trustees to file his response by September 19, 2014 and CFJB to file its reply by October 3, 2014. DE23.

its desire to represent other clients and the Subpoena Targets in this case. Specifically, in the "Introduction" to the Motion, CFJB focuses exclusively on the purported ethical dilemma in which it finds itself. CFJB contends its role is "complicated" by its long-standing relationship with clients other than the Subpoena Targets, that these other clients would have "well-founded objections" to this action and the discovery sought could they only be told of the discovery, and that it is in the "untenable position" of being unable to advise these other clients as to these proceedings, thus depriving them of their right to their choice of counsel. Motion at 2-3.

In the "Factual Background," CFJB contends that it first learned that the Trustee was conducting discovery with secrecy upon its retention by the Subpoena Targets and that, as a result, it cannot inform its other clients as to bases for challenging these proceedings. Motion at 4-5. These bases purportedly consist of:

(i)   The disconnect between the manner that the foreign bankruptcy proceeding has been conducted in Brazil and the strict requirements for due process in U.S. courts—so serious a discrepancy that this Chapter 15 proceeding should be dismissed;

(ii)  Braga's persistence in acting as if a pending appeal in Brazil has been finally resolved in his favor, which it has not; and

(iii) Braga's attempt to secure information beyond the permissible scope of discovery under the Bankruptcy Code (via 11 U.S.C. §1521(a)(4)) and this Court's Recognition Order, on 11 individuals and entities which are neither debtors nor identified as Related Entities to which the Brazilian bankruptcy has allegedly been extended.

Motion at 5-6. Nevertheless, CFJB's Motion goes well beyond these bases and raises issues as far afield as whether the recognition of a Brazilian bankruptcy that has been extended to third parties is manifestly contrary to the public policy of the United States under 11 U.S.C ¶ 1506. While many of CFJB's arguments prompt questions as to their own standing to assert them or

their relevance to the "Seal and Gag" order to which the Motion relates, none of these arguments have merit.

CFJB then filed a Motion to Extend Discovery Stay on September 3, 2014, DE25 which was scheduled for hearing for September 10, 2014, DE27, and to which the Trustee responded on September 9, 2014. DE30.   After the hearing, the Court entered an order granting in part and denying in part the motion to stay all discovery in the case, reiterating the continued viability, pending resolution of the hearing scheduled for October 16, 2014, of the seal and gag imposed earlier in the case, though not the subject of the motion being heard (the "Order"). DE31.[12]

Significantly, CFJB does not contend in any of its motions that the Subpoena Targets are even aware that CFJB has launched this litigation campaign seeking relief related to CFJB's other clients (thereby bringing additional scrutiny to the Subpoena Targets, their conduct since being served, and their relationship with the Related Entities).  As well, CFJB does not disclose whether it has shared the information it knows about its "other clients" with the Subpoena Targets either.  Of course, nothing is said about who is paying CFJB to attack the Court's Orders, the Trustee's efforts, and the Chapter 15 itself.  It does seem that

---

[12]      CFJB has since also filed a Motion for Leave to File a Notice of Appeal, to which the Trustee responded on September 17, 2014, and a Motion to Expedite Appeal. Notably, the Motion to Extend Discovery Stay asked for a stay of all discovery in the case or alternatively for a hearing date earlier than October 16, 2014. That motion did not request relief from the Court's prior order regarding sealing and non-disclosure but the Motion for Leave to File a Notice of Appeal nevertheless appears to rely on dicta in this Court's Order on the continued viability of its previous order as apparently creating grounds for a discretionary appeal. The transcript of the recent hearing shows that CFJB sandbagged the Trustee and the Court by arguing extensively about the continued non-disclosure order despite such aspect being subject to further briefing and a scheduled hearing.  The likelihood that the District Court will provide any relief from this Court's last order before October 16, 2014 is slim. The filing of the motion appears to be a strategic move by CFJB to have the Trustee divert time and resources on a premature appellate effort rather than on the Motion and the Trustee's continued investigation of CFJB's "other clients".

CFJB must have disclosed something to the Subpoena Targets who otherwise would find the stay of their response to the subpoenas to be highly unusual.

**D.  CFJB Actions Once Aware of Chapter 15 Case and Retained by Subpoena Targets**

CFJB has known of the existence of the Chapter 15 proceeding and the seal for some time. On July 10, 2014, Mr. Meeks (from CFJB's Miami office) reached out to Mr. Davis, who was then out of town, to discuss whether the Trustee would consent to allow them access to the sealed documents in the Chapter 15 case, at least as to Ms. Rabello as an identified potential third party. The Trustee informed Mr. Meeks that it was not willing to do so on July 23, 2014, and Mr. Meeks responded that he would be filing a motion to lift the seal as to Ms. Rabello within the next day or two. No such motion or any other challenge to the Chapter 15 Case was then filed.

In the interim, the subpoenas on BridgeHouse and Geofinance were served on July 15, 2014, in Miami and July 25, 2014, in Delaware, respectively. On August 12, 2014, Mr. Kirk, of CFJB's Tampa office, contacted Mr. Grossman requesting an enlargement of time to respond to the subpoena served on Geofinance, who allegedly had retained CFGB one hour earlier, and very likely as to BridgeHouse as well. Ms. Escobar responded on August 12, 2014, indicating the Trustee's agreement to the enlargement, and highlighting the fact that the subpoenas were under seal. Mr. Kirk responded on August 13, 2014, and, that same day, Ms. Escobar wrote to Mr. Kirk requesting an explanation as to the apparently unlikely coincidence of CFJB's representation of Ms. Rabello and now, the Subpoena Targets, albeit out of different offices. Six days later, Mr. Kirk responded that CFJB had pre-existing legal relationships with both Refinance and Ms. Rabello. In none of these correspondences did Mr. Kirk raise any issue as to any challenges to the Chapter 15 Action as a whole.

## ARGUMENT

### A.    CFJB Does Not Face Any Ethical Dilemma

CFJB contends that relief is appropriate based on a purported ethical dilemma affecting their other clients ability to be represented by counsel of their choice and their inability to advise them that discovery is ongoing as to them, citing to Rules 4-1.4(1)-(2) and 4.2.1 of the Florida Rules of Professional Conduct.  Motion, at 6-7.  None of the rules cited by CFJB creates an ethical conflict in this case and, to the extent it would, it is a conflict of CFJB's own making in accepting concurrent representation of the Subpoena Targets and the "other clients" in this matter.

Rule 4-1.4(a) (1) and (3), entitled "Communication," governs a lawyer's responsibility to inform a client as to the status of representation and requires the lawyer, among other things, to "(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in terminology, is required by these rules. . . [and] (3) keep the client reasonably informed about the status of the matter." Rule 4-1.4(a) (1), (3) (emphasis added).  Significantly, the comments provide that "[a] lawyer may not withhold information to serve the lawyer's own interest or convenience or the interests or convenience of another person" and that "***Rules or court orders*** governing litigation ***may provide that information supplied to a lawyer may not be disclosed to the client***.  Rule 4-3.4(c)[13] directs compliance with such rules or orders."[14]  Comment, Rule 4-1.4 (emphasis added).

---

[13]    Rule 4-3.4(c), governing fairness to opposing counsel and parties, provides, in relevant part, that a lawyer may not "(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

[14]    Rule 4-1.4, of the Model Rules of Professional Conduct, upon which the Florida rules are based, similarly provides, in the comments, as follows: "A lawyer may not withhold information to serve the lawyer's own interest or convenience or the interests or convenience of another

Here, even if a duty existed, which the Trustee disputes, this Court's Seal and Gag Order, as well as other relevant Florida Rules of Professional Conduct, "relieve" CFJB of any such alleged duty to advise its "other clients" about the existence of the subpoenas – to the contrary, CFJB is prohibited from doing so. And, to the extent that CFJB finds itself in an "ethical dilemma," it is one of its own making. When the Subpoena Targets approached CFJB, CFJB should have realized that it must comply with the duties arising out of representation of the Subpoena Targets, *i.e.*, the seal and gag, and such duty prevented disclosure of this same information to "other clients." If CFJB felt it could not comply with the Orders because of its entanglements with the "other clients," it should have declined representing the Subpoena Targets.

Rule 4-2.1, entitled "Advisor," which, in relevant part, provides: "In representing a client, a lawyer shall exercise independent professional judgment and *render candid advice*," fares no better. As an initial matter, CFJB's alleged inability to advise its "other clients" of well-founded objections they have to the entire Chapter 15 proceeding, Motion ¶ 2, is non-existent. The Petition and Order granting same are matters of public record about which CFJB apparently did advise its "other clients." Any objections these "other clients" may have had to the proceeding, recognition of the foreign bankruptcy proceeding in Brazil, Motion at 3, the purported disconnect as to the Petroforte Bankruptcy and due process, and alleged disagreements as to the status of appeals in Brazil, Motion at 5-6, could have been raised at any time after CFJB learned of the Chapter 15 case. Lastly, neither Rule 4-2.1, nor any of the other Rules cited by CFJB supersede the duties applicable to CFJB in a situation like this in which the Subpoena Targets approached

---

person. Rules or court orders governing litigation may provide that information supplied to a lawyer may not be disclosed to the client. Rule 3.4(c) directs compliance with such rules or orders.

CFJB for representation as to the subpoenas as prospective clients.  See infra.  Indeed, Rule 4-2.1 would not be implicated here at all had it not been for CFJB's acceptance of representation of the Subpoena Targets in this case knowing that this Court's seal Order put it in a position of knowing information another client would be interested in knowing about. [15]

Other rules, not cited by CFJB, are instructive as to the inexistence of any "ethical dilemma" here.  Rule 4-1.7(a), entitled "Conflict of Interest; Current Clients," provides that "[e]xcept as provided in subdivision (b), a lawyer must not represent a client if: . . . (2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  The comments to that rule further provide that "[l]oyalty to a client is also impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests."  The critical question is "the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client," considering "whether the client wishes to accommodate the other interest involved."[16]  Here, the

---

[15]     CFJB may, in fact, have already conflicted itself out of representing either the Subpoena Targets or the "other clients," thus requiring wholesale withdrawal from this matter.

[16]     Both the Model Rule and the comments are identical to the Florida Rule.  See Rule 1.7(a)(2) of the Model Rules of Professional Conduct ("(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: . . . (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer"); see also Rule 1.7 of the Model Rules of Professional Conduct, Comments ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests. . . . Conflicts arising out of duties to former clients are

21

limitation on dual representation existed and was evident to CFJB from the moment that the

Subpoena Targets provided the subpoenas about which they sought representation to CFJB and it

proceeded to accept them as clients *in this matter* anyway.

Rule 4-1.18, entitled "Duties to Prospective Client," also is instructive.  Part (a) of that

rule defines a "prospective client" as a "person who discusses with a lawyer the possibility of

forming a client-lawyer relationship with respect to a matter."  At the time that the Subpoena

Targets approached CFJB, they were "prospective clients."  Subpart (2) of the rule provides that,

"a lawyer who has had discussions with a prospective client shall not use or reveal information

learned in the consultation, except as Rule 4-1.9[17] would permit with respect to information of a

former client."[18]  The rules to that comment further explain that lawyers often must learn

---

discussed in the Annotation to Model Rule 1.9. Conflicts arising out of the duty to protect
information received from a prospective client are discussed in the Annotation to Model Rule
1.18").

[17]    Rule 4-1.9, governing conflicts of interests as to former clients, provides, in its entirety,
that a lawyer "must not" thereafter "(a) represent another person in the same or a substantially
related matter in which that person's interests are materially adverse to the interests of the former
client unless the former client gives informed consent; (b) use information relating to the
representation to the disadvantage of the former client except as these rules would permit or
require with respect to a client or when the information has become generally known; or (c)
reveal information relating to the representation except as these rules would permit or require
with respect to a client."

[18]    The Model Rules of Professional Conduct, Rule 1.18, is virtually identical.  See Rule
1.18 (a)-(b) ("(a) A person who discusses with a lawyer the possibility of forming a client-lawyer
relationship with respect to a matter is a prospective client. (b) Even when no client-lawyer
relationship ensues, a lawyer who has had discussions with a prospective client shall not use or
reveal information learned in the consultation, except as Rule 1.9 would permit with respect to
information of a former client"); see also Comment 3 to Rule 1.18 of the Model Rules of
Professional Conduct ("[3] It is often necessary for a prospective client to reveal information to
the lawyer during an initial consultation prior to the decision about formation of a client-lawyer
relationship. The lawyer often must learn such information to determine whether there is a
conflict of interest with an existing client and whether the matter is one that the lawyer is willing
to undertake. Paragraph (b) prohibits the lawyer from using or revealing that information, except

information "to determine whether there is a conflict of interest with an existing client and whether the matter is one that the lawyer is willing to undertake" and that subdivision (b) "prohibits the lawyer from using or revealing that information, except as permitted by Rule 4-1.9, even if the client or lawyer decides not to proceed with the representation." Rule 4-1.9(c) provides that a lawyer must not "reveal information relating to the representation except as these rules would permit or require with respect to a client." Here, had CFJB received the information at issue from a client, which ultimately is what the Subpoena Targets are (Mr. Kirk admitted to Mr. Grossman that Geofinance had just been retained to represent it in this matter and that representation of BridgeHouse was yet uncertain), CFJB could not disclose that information to any other client. The situation here is no different. As such, since CFJB is prohibited from disclosing the information gained from the Subpoena Targets under Rule 4-1.18 and 4-1.9, as well as this Court's Order, no "ethical dilemma" exists and no duty to disclose or advise exists. Cf. Maale v. Caicos Beach Club Charter, Ltd., Case No. 08-80131-CIV 2010 WL 272913 (S.D. Fla. Jan. 15, 2010) (denying motion to compel discovery when information sought pertained to contact information of former client who also had contacted firm in interim as prospective client when information had been learned during consultation and disclosure thereof was prohibited by Rule 1.18). That the Subpoena Targets went from "prospective clients" to "clients" does not change anything as, the same disclosure rules apply.

In the end, the issue for present purposes is not whether a conflict exists or not, or whether withdrawal is necessary or not, but rather, that no ethical duty exists requiring CFJB to disclose anything to any "other clients." The ethical rules provide that CFJB would not be authorized to inform its "other clients" if a prospective client approached CFJB to sue these

as permitted by Rule 1.9, even if the client or lawyer decides not to proceed with the representation. The duty exists regardless of how brief the initial conference may be").

"other clients."  Similarly, CFJB has no duty to disclose that discovery about these "other clients" is being sought.

**B.**     **No Basis Exists to Grant CFJB Relief from the Non-Disclosure Provisions of this Court's Order as to CFJB or at All**

CFJB contends that the entry of "gag orders" as to parties and witnesses are rare and issued only for the most compelling of reasons, citing cases involving government interests.  See Motion at 7-9.[19]  But, that is not the point.  Other than purely speculative alleged harm that the alleged "gag" may cause these "other clients" from obtaining advice from their chosen counsel,[20]

---

[19]     All of the cases cited upheld the gag order based on a showing of a compelling government interest.  See Sheppard v. Maxwell, 384 U.S. 333 (Sup. Ct. 1966) (limitations on communications with media and sequestration of the jury, among other things, should have been imposed when media circus in which both parties, witnesses and others participated deprived defendant of fair trial); In re Application of Dow Jones & Co., 842 F.2d 603 (2d Cir. 1988) (affirming gag on parties to criminal proceeding when voracious fire of publicity and risk to fair trial outweighed any first Amendment right of media); Constand v. Cosby, 229 F.R.D. 472 (E.D. Pa. 2005) (limiting counsel's ability to make extrajudicial statements in the absence of information already being public pursuant to rules regulating the bar, refusing to seal names of Jane Doe potential abuse victims when, inter alia, identified "Jane Does" had not sought such relief, and refusing to seal all discovery when no connection was made as to any particular discovery and the alleged harm, noting normally non-public nature of discovery); U.S. v. Koubriti, 307 F.Supp.2d 891 (E.D. Mich. 2004) (affirming restriction on public statements about the case and application to post-trial proceedings involving terrorist attack on 9/11 in the interests, inter alia, of the fair administration of criminal justice and court's continued review); Koch v. Koch Industries, Inc., 6  F. Supp. 2d 1185 (D. Kan. 1998) (upholding gag of parties, witnesses and others as to discussions about the case and limitation of juror access to press to support compelling government interest in impartial jury); U.S. v. Jacobson, 785 F. Supp. 563 (E.D. Va. 1992) (granting protective order to prevent public knowledge as to identity of parents and children in case pertaining to unlawful insemination to protect compelling interest in psychological health and welfare of children).

[20]     The notion that CFJB's "other clients" are being harmed because they are deprived of counsel of their choice is laughable unless CFJB contends that it is now precluded from representing these "other clients" because of what it knows (a position CFJB has not asserted and a position that should have impacted their decision to take on the Subpoena Targets as clients in the first place).  The current status is that CFJB's "other clients" are not able to learn information that CFJB itself only knows because of the alleged happy coincidence that the Subpoena Targets decided to retain CFJB to respond to subpoenas.  It is the not the "other clients" need for counsel

and unsubstantiated and unfounded accusations against the Trustee of abusing discovery or failing to follow the law and this Court's Order in the scope of discovery sought, the instances in which seals are appropriate cited by CFJB are not, and are not contented to be, exclusive. Motion at 7-9.

In fact, cases provided by CFJB at the hearing on the Motion to Stay show that orders as to non-disclosure also have been entered to protect the integrity of parties' settlement negotiations and when disclosure would violate the law and the rules of professional conduct. See In re Matter of W.T. Grant Co., 6 B.R. 762 (S.D.N.Y. 1980) (granting injunction of dissemination of letter to creditors and debenture holders when same included only one-sided information as to pretrial settlement and offer pertaining thereto and such disclosure would violate a number of laws and constitute a violation of the Rules of Professional Conduct); Lynch v. California Public Utilities Com'n, 311 B.R. 798, 804 (N.D. Cal. 2004) (failure to appear and object as result of proposed settlement agreement was not excused by gag that prevented disclosure of information as to negotiations related thereto to protect confidentiality thereof when the proposed settlement was of public record). In re Oliver, 333 U.S. 257 (U.S. 1948) (reversing conviction entered in secrecy in grand jury proceeding when due process requires that no person's life liberty or property be forfeited as a punishment until charges are fairly made and trial fairly had in open court) (cited for proposition of inquisitorial methods that they claim the trustee cannot be trusted to follow as with closed proceedings of old).[21]

---

of their choice that is driving this effort; it is CFJB's desire to use information it obtained from another client to help these "other clients".

[21]    CFJB's contention that the discovery that was stayed in the 1782 Proceeding, is the same discovery sought here, Motion at 8, is incorrect.  First, CFJB has not shown that the same discovery targets in the 1782 Proceeding from which discovery was sought, including itself and a lawyer at the firm, have been targeted here.  They cannot.  Second, a comparison of the

25

This is exactly the type of case in which a non-disclosure order is proper.  The Supreme

Court has ruled that orders prohibiting dissemination of discovery efforts and discovered

information are not subject to a strict First Amendment scrutiny, i.e., compelling governmental

interest, as "pretrial depositions and interrogatories are not public components of a civil trial,"

were not considered public at common law and are not so conducted in practice, and "an order

prohibiting dissemination of discovered information before trial is not the kind of classic prior

restraint that requires exacting First Amendment scrutiny".  Seattle Times Co. v. Rhinehart, 467

U.S. 20, 33-34 (1984).[22]  In deciding whether to issue an order prohibiting disclosure of

discovery materials, the court must consider whether the order serves an "important or

substantial" interest other than suppression of speech and whether the restriction on speech is no

greater than necessary to protect that interest.  Id. at 32.  Moreover, "material filed with

discovery motions is not subject to the common law right of access" because "these materials are

neither public documents nor judicial records."  Chicago Tribune v. Bridgestone/Firestone, Inc.,

263 F.3d at 1311, 1313 (11th Cir. 2001).  A protective order forbidding public disclosure of facts

gained through discovery will be granted when the movant shows a particularized harm resulting

from disclosure and that a balancing of public and private interests support non-disclosure.  In re

---

subpoenas here and in those proceedings shows that the discovery sought is not the same.  And,
third, what discovery was stayed in the 1782 Proceeding is irrelevant to the issues here as, among
other things, the Brazilian bankruptcy proceedings have progressed to the point where the
grounds alleged for such stay are now moot.

[22]    CFJB's concern that the 2004 Examinations for discovery of documents will proceed in
secrecy, with no other interested parties involved, Motion at 8, is a red herring.  As the Supreme
Court has noted, discovery in civil matters is not public as a matter of law and, as a matter of
practice, routinely is conducted solely between the parties involved without the involvement or
knowledge of others.  See supra.  CFJB's further rhetoric that even this Court may be "unaware
of how broad a clandestine net the Trustee is casting," Motion at 8, is no more relevant in this
case than in every other case because the courts do not "pre-clear" subpoenas before issuance.  In
any event, in light of CFJB's filing of the subpoenas served on the Subpoena Targets, CFJB's
concerns are demonstrably without merit.

26

Roman Catholic Archbishop of Portland in Oregon, 661 F.3d 417, 426-28 (9th Cir. 2011) (non-disclosure of name of retired priest warranted when harm to priest if disclosure was made was found and public interests implicated did not outweigh priests privacy interest).  The relief requested here satisfies these standards.

First, non- disclosure here is necessary to protect an important and substantial interest that would result in particularized harm, *i.e.*, prevention of the Trustee's investigative efforts from being completely frustrated.  Specifically, as the Trustee has demonstrated, and has been shown to be a real threat based on former unlawful conduct, if the financial entities and third parties the Trustee seeks to subpoena and their personnel and counsel are not restrained from revealing the fact and content of the Trustee's discovery efforts, the purpose of such discovery likely will be thwarted as subpoenaed targets may be pressured, documents may be destroyed, and assets may be diverted.

CFJB's argument at the Stay Hearing that, because its "other clients" know that they would be the subject of discovery or other relief in this case based on the disclosures in the Chapter 15 case changes nothing.  See, e.g., Hearing Tran. at pgs. 52-53 **(Exhibit M)**.  Knowing someone is in pursuit is far different than knowing if, when, and how you might be caught.  Second, this interest outweighs any interest argued by CFJB to support the lifting of the non-disclosure order.  In fact, CFJB's dual representation here may already have resulted in the type of pressure on the Subpoena Targets and tampering of which the Trustee was concerned.  The Subpoena Targets, which have not sought a motion for protective order on their own behalf, would not appear to have any interest in the relief sought by CFJB, but yet, have, presumably on the advice of CFJB, sought and obtained a stay of discovery as to them based on the interest and concern CFJB contends its "other clients" may have.   This presumes that the Subpoenaed

Targets and CFJB have not violated this Court's orders and already disclosed the subpoenas and discovery sought with the "other clients."

Third, the non-disclosure order also is narrowly tailored to the specific interest being protected. Non-disclosure is limited to the investigative efforts and information the Trustee has engaged in and obtained to date and the Trustee's discovery efforts. Furthermore, as granted by this Court, the non-disclosure order is limited in duration to 180 days, after which it will expire absent further application and order of the Court.

The Court's decision is not unprecedented. As CFJB recognizes, Motion at 10, the court in In re Transbrasil S.A. Linhas Aereas, 11-19484-BKC-AJC, 2014 WL 1655990 (Bankr. S.D. Fla. 2014), entered a gag order similar to that at issue here under circumstances very similar to those here. Thereafter, upon the non-compliance with such order, allegedly inadvertently, by disclosure of the subpoenas to entities about which discovery was sought, those third parties challenge the court's order. Even then, the court did not find its previous gag order inappropriate. Id.

The non-disclosure Order, or gag as it is being referred to, was properly granted and no reason exists to lift it now.[23]

### C. No Basis Exists to Limit the Sealing of the Motion to Seal, Orders Thereon and Subpoenas Based on Protections for Confidential Research Under Both § 107 and the Common Law

CFJB argues that a seal is not appropriation because the standard under § 107 of the Bankruptcy Code has not been satisfied by the Trustee's alleged "tortured" interpretation

---

[23] CFJB's implication that the "applicant for the seal and gag order cannot be trusted to follow this Court's directions" is wholly unfounded, and CFJB offers no factual basis for such a contention. Motion at 9. None exists. Similarly, its attempt to analogize the discovery sought under seal and gag to "inquisitorial methods that may be commonplace in other parts of the world [that] have no place in Anglo-American jurisprudence, such as the Star Chamber and the Inquisition, Oliver, 333 U.S. at 268, Motion at 9-10, is simply absurd.

"optimistically misconstrue[ing] Congress's intent (to be addressed another day) and that, even if appropriate, the seal is not sufficiently limited. Motion at 9-11.

Certain fundamental legal principles relevant to the Orders are undisputable. "The right of public access to court records … is not absolute." In re Orion Pictures Corp., 21 F.3d 24, 27 (2nd. Cir. 1994) (upholding of confidentiality order under § 107). Similarly, courts of the United States have the power to issue orders sealing their files and protecting confidentiality of documents. See, e.g., Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1307 (11th Cir. 2001) (vacating order of the trial court to unseal documents).

The circumstances disclosed in the Trustee's Motion to Seal justify the sealing order both under § 107 and the common law. The information provided in the Trustees' sealed motion is confidential research of the Trustee and the Trustee has demonstrated good cause for the issuance of the seal to cover all aspects of the investigation, including the identity of any party who has received a subpoena and any target of such subpoena.

1. **Sealing of the Motion to Seal and the Subpoenas is Appropriate under § 107**

Contrary to CFJB's contention, the requirements for sealing under § 107 are satisfied here, and the following interpretation is neither "tortured" nor "optimistically misconstrues" § 107. While it is not clear what standard CFJB appears to contend to apply to § 107, it appears, based on the cases it cites, that it believes that relief under that section is available only if compelling circumstances are shown. In the Motion to Seal and Gag, the Trustee has revealed to this Court confidential research relating to the highly sensitive search for assets and financial records of Petroforte and Related Parties which is the subject of non-discretionary protection under § 107(b)

Section 107 provides:

> (b) **On request of a party in interest, the bankruptcy court shall**, and on the bankruptcy court's own motion, the bankruptcy court may—
>
> > (1) protect an entity with respect to a trade secret *or confidential research*, development, or commercial information; or
> > (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107 (emphasis added).  The use of the word "shall" signifies that this section *requires* a bankruptcy court, upon the request of any party in interest, to order any files containing, *inter alia*, "confidential research" to be sealed.  "In the bankruptcy area, . . . congress has established a special rule for trade secrets and confidential research, development, and commercial information.  As explained in Senate Report No. 989, § 107(b) 'permits the court, on its own motion, and **requires the court, on the request of a party in interest, to protect** trade secrets, **confidential research**, development, or commercial information.'" *Orion Pictures*, 21 F.3d at 27 (emphasis added).

Furthermore, while the Trustee has satisfied the "good cause" requirement under the common law as well, *see infra*, Congress deliberately omitted the requirement that the movant establish "good cause," which is normally a condition precedent to sealing public records, when it enacted Section 107(b).  Specifically,

> [w]hen congress addressed the secrecy problem in § 107(b) of the Bankruptcy Code it imposed no requirement to show "good cause" as a condition to sealing confidential commercial information. This omission is particularly significant because FRCP 26(c), from which the language of § 107(b) appears to have been drawn, expressly required "good cause" to be established before a discovery protective order could be granted-even when the material sought to be protected was "a trade secret or other confidential research, development, or commercial information".

Id. at 28; see also Roman Catholic Archbishop, 661 F.3d at 430 ("Because § 107 speaks directly to and conflicts with significant aspects of the common law right of access, we join our sister circuits in holding that § 107 preempts the common law right of access in bankruptcy

proceedings"). Orion Pictures has been cited with approval by at least one Court in this District. See In re El Toro Exterminator of Florida, Inc., 2006 WL 2882519 (Bankr. S.D. Fla. 2006) (Isicoff, J.) (ordering certain information to be kept confidential).

Here, without any analysis as to the interpretation or application of § 107 to the facts of this case, CFJB merely concludes that relief thereunder is not appropriate. Motion at 9-11. While CFJB cites several cases in which motion for seal were rejected, all of them are inapposite to the situation here as, in each, the motion to seal was brought by a non-party. The cases cited by CFJB either do not address § 107 at all or address situations when, unlike here, the parties to be protected by the relief sought were not the debtor. In re Bankest Capital Corp., 2007 WL 313301, 2007 WL 313301 (Bkrtcy. S.D. Fla. 2007) (compelling reasons would be necessary in order to justify imposing a cloak of secrecy over Rule 2004 examination of a corporate representative of the defendant and of a significant third party corporate witness and that the basis of the motion, a litigation tactic to protect itself from litigation with third parties did not satisfy this standard); In re Global Vending Inc., Adv. No. 05-2417-JKO, 2006 WL 1679732 (Bkrtcy. S.D. Fla. 2006) (denying motion by Trustee, filed solely upon demand of third party, to file settlement agreement under seal without prejudice when only claim as to need to do so was that information constituted confidential business information and that it would harm the movant's business, both of which bases the court rejected, finding that no showing had been made as to any confidentiality or giving competitors an unfair business advantage); In re Hemple, 295 B.R. 200 (Bkrtcy. D. Vt. 2003) (denying motion seeking to protect rights of non-debtor to file settlement agreement under seal without prejudice when no showing of compelling circumstances as outlined by factors set forth by that court had been shown); In re Petition of Len B. Blackwell, 264 B.R. 505, 508-09 (W.D. Tex. 2002) (refusing to allow confidentiality of

creditor names in response to challenge by newspaper when two rules of bankruptcy specifically required names and only "that the investors share a general fear of wealth-targeted violence, . . not [that] the investors' claims that these proceedings, or the publication of their names, increase their risk").[24] Here, the Trustees has presented the Court with confidential research and sealing such information is absolutely necessary in order to protect the highly sensitive investigations described therein.

As CFJB recognizes, the most recent decision in this District as to the propriety of a seal and other relief sought by a trustee, such as is the case here, was decided by Judge Cristol in In re Transbrasil S.A. Linhas Aereas, 11-19484-BKC-AJC, 2014 WL 1655990 (Bankr. S.D. Fla. 2014). There, upon challenge by persons about which the subpoenas to third parties requested information, the court reaffirmed his earlier order sealing the file and, inter alia, forbidding discovery targets from disclosure of the subpoenas received, based on ¶ 107(b) on the basis that the motion contained information as to work-product related to the investigation already conducted and further investigation to be conducted. *1-2. The court further held that, at the time of the issuance of the order, good cause had been shown as disclosure carried the likelihood of compromising the Trustee's efforts. Id. at *2. As the court explained, "efforts to conceal assets or the dissipation of assets have been considered deserving of sealing orders," and this

---

[24]    The citation of cases in support of the disfavored nature of protective orders and filings under seal in the context of District Court proceedings are inapplicable and distinguishable in any event. See Andrews v. Prospect Mortgage, LLC, 2013 WL 6382994, *1-2 (S.D. Fla. 2013) (denying motion for protective order in case involving Fair Labor Standards Act when information sought to be sealed pertained to current and former employees that were presumably plaintiffs and thus had agreed to submit themselves to open court by their filing of suit and, in the absence of any showing of good cause, court was "left to wonder" why the information was needed or at issue in the case); Arison-Dorsman v. Glazer, 2004 WL 1368866, *1 (S.D. Fla. 2003) (denying motion to exclude press from the trial of a case under the Hague Convention on Child Abduction in the absence of a showing of a compelling government interest to safeguard the child when, inter alia, U.S. and Israeli governments had expressed interest in the case). Here, 11 U.S.C. 107 specifically governs the propriety of sealing the information at issue.

32

supported the continuation of the seal as to the sealed document based on a showing that the movants already had taken previous action to interfere with the trustee's investigative efforts. Id. at *2. The court further found that filings under seal were not violative of public policy under § 1506. Id. at *2.[25] Ultimately, however, because the existence and scope of the subpoena there had already been made known to the movant, thus obviating the basis for the seal and gag orders, the court ordered that all future filings would be filed openly absent specific motion and order allowing the filing under seal.

### 2. Here, the seal is necessary to protect the confidential research of the Trustees

The Motion to Seal, in which the Trustee revealed information as to his investigations in Brazil and abroad so that it may understand why the seal and gag as to the motion, order thereon, and other discovery matters should be kept under seal, establishes that the information contained therein is confidential research that falls within the scope of § 107(b). The Trustee's Motion to Seal and the corresponding Orders of this Court, if unsealed, and the discovery material if unsealed at this time, thus would divulge sensitive details of the confidential research of the Trustee. This is particularly true considering the extensive machinations by some of CFJB's "other clients" to deprive the Petroforte Bankruptcy of the Sobar plant, the subsequent untruthful statements made by some of CFJB's "other clients" to the STJ in an attempt to prevent the extension of the bankruptcy to such clients and subjecting assets, including the Sobar plant, to seizure by the Trustee, and the extensive dilatory tactics by those parties in those proceedings.

*The Standard for the Common Law Right of Access is Inapplicable and, Even if it Were, the Seal is Supported by Good Cause as Required For a Seal.* CFJB's proposed

---

[25]    The court also noted that the fact that an order authorizing the trustee to conduct his investigation under seal was on appeal in Brazil did not change the effect of the order as to the Chapter 15 proceedings as the order continued in effect in the Brazilian proceedings. Transbrasil, 2014 WL 1655990 at *2 n.2.

compelling circumstances standard is similarly inapplicable under the common law to the issues in this case.    The common law right of access, with its corresponding "compelling circumstances" standard, does not apply.  Rather, to the extent this issue is not wholly governed by § 107, the common law standard of good cause sufficient to support a protective order against a challenge founded on either the common law or first amendment right of access to judicial proceedings governs the propriety of the seal here.  Because the Motion to Seal established good cause, the Court should now deny the Motion.

While "courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents,'" Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 & n. 7 (1978), and this right is not absolute. In fact, numerous courts have recognized the limited application of this common law right.  See Romero v. Drummond Co., Inc., 480 F.3d 1234, 1235 (11th Cir. 2007) ("This right of access is not absolute, however. The right of access does not apply to discovery and, where it does apply, may be overcome by a showing of good cause."); Nixon, 435 U.S. at 589 ("It is uncontested, however, that the right to inspect and copy judicial records is not absolute."); Chicago Tribune, 263, F.3d at 13011 ("The right to inspect and copy is not absolute") (internal citation omitted).

*The Right of Access is Inapplicable to the Subpoenas*.  The Eleventh Circuit Court of Appeals has determined that the common law right to access does not apply to discovery materials.

> Although there is some disagreement about where precisely the line should be drawn, when applying the common-law right of access, federal courts traditionally distinguish between those items which may properly be considered public or judicial records and those that may not; the media and public presumptively have access to the former, but not to the latter. An illustrative example is the treatment of **discovery material,** *for which there is no common-* *law right of access***, as these materials are neither public documents nor judicial records.**

Chicago Tribune, 263 F.3d at 1311; accord McCarthy v. Barnett Bank of Polk County, 876 F.2d

89 (11th Cir. 1989) ("an individual has no common law right to discovery material because those

materials are not judicial records or public records"); Romero, 480 F.3d at 1234 ("The right of

access . . . does not apply to discovery and, where it does apply, may be overcome by a showing

of good cause."); In re Denture Cream Products Liability Litig., 2013 WL 214672 (S.D. Fla. Jan.

18, 2013) (holding that because it was "undisputed that the documents at issue were exchanged

between the Parties during discovery and further that the documents have not been filed in this

Court record, other than for purposes of the instant Motion, which pertains to disclosure of

discovery materials," the common law right of judicial access did not apply.); Luzzi v. ATP

Tour, Inc., 2011 WL 2693542 (M.D. Fla. July 12, 2011) (denying motion to unseal documents

because the discovery sought outweighed "any right of public access."); see also Bond v. Uteras,

585 F.3d 1061 (7th Cir. 2009) (denying access to sealed "discovery materials that have never

been filed with the court and have never influenced the outcome of a judicial proceeding.");

Anderson v. Cryovac, Inc., 805 F.2d 1 (1st Cir. 1986) (concluding that, "[the Court] think[s] it is

clear and hold[s] that there is no right of public access to documents considered in civil

discovery motions."); Flagg ex. Rel. Bond v. City of Detroit, 268 F.R.D. 279 (E.D. Mich. 2010)

(denying a motion to unseal because "the parties are still engaged in discovery, and no sealed

materials have been filed for the purpose of securing this Court's ruling on the merits of any

substantive issue, claim, or defense.").

 Here, only discovery-related matters have been conducted under seal.

 **_The Right of Access is Inapplicable to the Motion to Seal and Orders Granting Same_**.

The Eleventh Circuit also has held that "[d]ecisions less central to merits resolutions implicate

lesser right-to-access considerations." Romero, 480 F.3d at 1236.   Dispositive motions are

central to the merits, while nondispositive motions are not. In <u>In re Estate of Martin Luther King,</u>

<u>Jr. Inc. v. CBS, Inc.</u>, 184 F. Supp. 2d 1353, 1365 (N.D. Ga. 2002), the district court interpreted

the Eleventh Circuit's decision in *Chicago Tribune*, and held:

> "[E]ven where litigants file discovery materials with a court in connection with
> pretrial discovery motions, such as motions to compel, the supporting discovery
> documents are **not subject to the common-law right of access**. However,
> discovery materials filed with the court 'in conjunction with pretrial motions
> that require judicial resolution of the merits are subject to the common law right
> . . . .' This is because, unlike privately exchanged discovery materials,
> 'documents filed as part of a dispositive motion, such as a summary judgment
> motion,' assist the court in determining the parties' substantive rights, serve as a
> substitute for trial, and render those discovery documents 'judicial.'"

<u>Id.</u> at 1365 (emphasis added).

Here, the seal protects privately exchanged discovery materials, such as subpoenas and

any documents received as a result thereof, which have not been filed with the Court except in

connection with the nondispositive Motion to Seal. In the context of this Chapter 15 Case, the

parties' substantive rights will only be determined if and when an adversary proceeding or

contested matter is commenced. Thus, the discovery materials are not subject to the common

law right of access to judicial records because they are not judicial records.

***Good Cause Has Been Demonstrated Here in Any Event***. In the event that the Court

determines that the common law right of access applies, the Trustee carries the burden of

establishing good cause for the seal. "The common law right of access may be overcome by a

showing of good cause, which requires balancing the asserted right of access against the other

party's interest in keeping the information confidential. . . . In balancing [these interests], courts

consider, among other factors, whether allowing access would impair court functions or harm

legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability

of the information, whether there will be an opportunity to respond to the information, whether

the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents" *Romero*, 480 F.3d at 1246 (internal citation omitted).  "Although difficult to define in absolute terms, [good cause] generally signifies a sound basis or legitimate need to take judicial action. In a different context, this court has identified four factors for ascertaining the existence of good cause which include: '[1] the severity and the likelihood of the perceived harm; [2] the precision with which the order is drawn; [3] the availability of a less onerous alternative; and [4] the duration of the order.'" In re Alexander Grant & Co. Litig., 820 F.2d 352, 356 (11th Cir. 1987) (citing Kleiner v. First National Bank of Atlanta, 751 F.2d 1193, 1205 (11th Cir. 1985)).

The constitutional right of access with respect to disclosure of discovery materials is also appropriate upon a showing of good cause.  McCarthy v. Barnett Bank, 876 F.2d 89 (11th Cir. 1989); see also  Chicago Tribune, 263 F.3d at 1310 ("Materials merely gathered as a result of the civil discovery process, however, do not fall within the scope of the constitutional right of access's compelling interest standard.").  In re Rothstein Rosenfeldt Adler, P.A., 09-34791-BKC-RBR, 2010 WL 1946315 (Bankr. S.D. Fla. 2010), cited by CFJB, Motion at 10, similarly is instructive.  In Rothstein, the court held that the risk that the discovery targets' lifestyle, value of interest at law firm and their income at the firm did not justify exclusion of the media at their deposition given the public nature of the targets and that the proposed depositions implicated the largest Ponzi scheme in the history of South Florida.  In reaching this conclusion the court explained, disagreeing with Judge Cristol in Bankest, that "pretrial depositions and interrogatories are not public components of a civil trial," and that, as such, the compelling reason requirement imposed on Rule 26's good cause requirement was inapplicable. Id. at *2-3 (internal citations and quotations omitted).  Instead, the court held that, since "[p]ublic disclosure

of discovery material is subject to the discretion of the trial court and the federal rules that circumscribe that discretion[,]" the proper test is a "balancing of interest test to determine whether the [party's subject to discovery] have demonstrated good cause exists for a protective order under Rule 26(c)." Id. at *3 (internal citations and quotations omitted).

The Motion to Seal establishes good cause for keeping all aspects of the Trustees' investigation under seal. The Trustees' motion, the corresponding orders and the discovery authorized thereunder include sensitive details regarding the progress of the investigation and if unsealed at this time could compromise the efficacy of a decade of work to recover some of the hundreds of millions of dollars in losses incurred by creditors. Concerns about efforts to conceal assets or the dissipation of assets have been considered as interests deserving of sealing orders, especially when, as here, there is a record of past attempts to hide assets otherwise subject to the creditors' claims or other wrongdoing. See, e.g., Commodity Futures Trading Com'n v. Bolze, 2009 WL 605248, *1 (E.D. Tenn. 2009) (granting ex parte motion to temporarily seal file to prevent defendant from hiding assets); Fed. Trade Com'n v. USA Beverages, Inc., 2005 WL 3676636, *2 (S.D. Fla. 2005) (granting ex parte motion to seal file and docket because of risk of further dissipation of assets by defendants).

The seal in this case balances the interests of the creditors' estate with the interests of the general public in transparent legal proceedings and is appropriately limited. First, the seal is temporary in nature and the Trustee has no objection to an appropriate confidentiality undertaking to protect confidential financial information obtained as a result of any subpoena. Second, there is no "blanket seal" over these proceedings, because only those matters relating to the sensitive investigation are under seal.

CJFB's reliance on <u>Newman v. Graddick</u>, 696 F.2d 796, 802 (11th Cir. 1983) (quoting <u>Globe Newspaper Co. v Superior Court for the County of Norfolk</u>, 457 U.S. 596 (1982)), for the proposition that, at the very least, the documents under seal should be redacted to only hide such information to "narrowly tailor the seal" is misplaced. See Id. at 801-03 (holding that media access to prisoner release records could not be curtailed in civil context, without deciding whether rule applied to all civil trials on the basis that "civil trials that pertain to the release or incarceration of prisoners and the conditions of their confinement are presumptively open to the public," warning that the right to access is not absolute where "it may interfere with the administration of justice"); <u>Globe Newspaper Co.</u>, 457 U.S. at 596 (holding that closure of criminal trial to press was proper only if necessitated by a compelling government interest and if narrowly tailored to serve that interest, relying on First Amendment right to access to criminal proceedings and constitutionally protected discussion of governmental affairs).

The Motion to Seal, the Courts Orders in relation thereto, and the subpoena(s) issued in connection with the investigation, must remain under seal for the duration of the Trustee's investigation because the disclosure of facts relating to the Trustee's discovery efforts or the information obtained to date could assist the culprits in further concealing assets of the debtor.

**D.    No basis exists to disclose the subpoenas to CFJB (or its "other clients")**

CFJB claims that "it is clear" that its other clients have "ample grounds to seek relief from this Court," Motion at 11, on the basis that "(i) Chapter 15 entitles the discovery targets to notice of and the right to participate in this proceeding, and (ii) the interests of justice will not be served by the Subpoenas' enforcement while a questionable order is on appeal in Brazil," and, based thereon, that those clients "would move to: (i) vacate the Recognition Order and dismiss the Chapter 15 proceeding, (ii) terminate the discretionary relief granted to Braga, including the

right to take discovery of individuals and entities that are not Related Entities of the Brazilian bankruptcy, (iii) vacate the Seal Order and Gag Provisions, and (iv) quash or limit the Subpoenas." Motion at 11-12.

As an initial matter, CFJB's standing to raise these arguments going to the merits of the Chapter 15 Case itself is questionable, particularly in light of the fact that its "other clients" could have raised most of these arguments because the Petition is a matter of public record. In any event, however, all of CFJB's arguments lack merit.

### i.    CFJB's Reliance on Section 1525(b) is Misplaced

CFJB relies upon section 1525(b), entitled "Cooperation and direct communication between the court and foreign court or foreign representative," provides that "[t]he **court is entitled to communicate directly with**, or to request information or assistance directly from, **a foreign court or a foreign representative**, subject to the rights of a party in interest to notice and participation." 11 U.S.C. § 1525(b) (emphasis added). The Guide to enacting and interpreting the model law, which provides guidance on the interpretation of Chapter 15, further provides that such "**communication** . . . should be done carefully and with appropriate safeguards for the protection of substantive and procedural rights of the parties" and that "**communications** should be done openly, in the presence of the parties involved (except in extreme circumstances), who should be given advance notice." Motion at 12 (citing Guide) (emphasis added). The express language of § 1525 makes it evident that this provision is intended to ensure that the communications between the domestic bankruptcy court and the foreign court and representative be undertaken with due regard for the rights of the parties.

CFJB's reliance on § 1525 is misplaced and its argument is wholly baseless. The clear text of § 1525(b) indicates that the "notice and participation" referred to therein applies solely to

communications between this Court and the Brazilian Bankruptcy Court and this Court and the Trustee. Other than its tortured interpretation of § 1525(b), CFJB has not cited any authority to support the application of this provision to the "seal and gag order" here and none exists.[26]

### ii.    The Interests of Justice Based on the Status of the Brazilian Proceedings Do Not Supports Failure to Enforce Subpoenas

CFJB contends that the subpoenas should not be enforced based on certain proceedings in the Petroforte Bankruptcy. Motion at 13-16. Specifically CFJB claims that the Trustee's attempts to obtain discovery about its other clients is invalid because, *inter alia*, the Trustee's claims and investigations purportedly arise solely out of one transaction, the Sobar plant, purportedly unrelated to Securinvest and the Rabello family, Motion at 13-14; several appeals have been filed during the course of the Petroforte Bankruptcy related to, among others, Securinvest, Ms. Rabello, and other entities forming part of the same economic group, Motion at 14-15; and a settlement between the foregoing entities and the Estate was approved and appealed in Brazil. Motion at 15-16. As set forth more fully above, and evidenced by the documents attached hereto, it is CFJB that either does not understand or has materially misapprehended what has occurred in and the status of the proceeding and appeals in Brazil.

As an initial matter, CFJB's continued insistence that the Rural Group, owned by the Rabello family, and the Petroforte Group have not been found to constitute a common economic group, Motion at 15, which finding forms the core basis for CFJB's argument, is simply wrong. The STJ already addressed the issue and the case was not remanded to the Brazilian Bankruptcy

---

[26]    In re Tri-Continental Exchange Ltd., 349 B.R. 627, 627-40 (Bktcy. E.D. Cal. 2006), does not stand for the contention that notice is required here. In Tri-Continental, the court refused to impose additional restrictions on the foreign representative's request to be entrusted to administer funds to be released by the U.S. government on the basis that "Chapter 15 provides sufficient procedures for cooperation and communication," amongst other things, when no basis existed to impose such restrictions and the movant, while claiming a lien on such funds, had not yet proved its entitlement to such lien.

Court as a result of that decision at all. In the decision issued on August 9, 2011, the STJ held that "not only in relation to the Agroindustrial complex Sobar, but also in relation to the other assets, the corporate chain described herein shows the existence of a modus operandi that confirms the influence of a group of companies (Securinvest Group, whether or not [it] is part of the Rural Group) over the other (Petroforte)". S.T.J. Reg. No.2010/0134557-7, Relatora: Nancy Andrighi, 09.08.2011, p.12; **(Exhibits K & L);** <u>see supra</u> <u>factual background Part B</u>. As a result of the STJ decision, Securinvest filed an application for leave to bring an Extraordinary Appeal to the STF and a litany of other appeals and motions for clarifications essentially challenging the extension orders, set forth more fully above, while simultaneously proposing a settlement before the Brazilian Bankruptcy Court, which was approved but then rejected. All such tactics have, to date, been rejected by all appellate courts in Brazil.

Furthermore, the foregoing and the following points related to the Brazilian proceedings, which definitively establish that CFJB's contention that Ms. Rabello's and Securinvest's inclusion in the Petroforte Bankruptcy remain on appeal is wrong, are determinative of the lack of merit of CFJB's position:

- Securivest has been joined to the Petroforte Bankruptcy, is considered bankrupted in the Brazilian Bankruptcy Court proceeding, and that decision is final, <u>see supra</u> <u>factual background Part B</u>, **(Exhibits A, B, C, D, F, K & L)**;

- Ms. Rabello has been joined to the Petroforte Bankruptcy and is considered bankrupted in the Brazilian Bankruptcy Court proceedings, <u>see supra</u> <u>factual background Part B</u>, **(Exhibit E)**;

- The existence of a common economic group between the Petroforte Group and the Rural Group has been found by various courts and those decisions are effective in

the Brazilian Bankruptcy Court proceedings, see supra factual background Part B, **(Exhibits A, B, C, D, E, F, K & L)**;

- The Sobar transaction has been found to be fraudulent, has been seized by the Estate, and that decision is final, see supra factual background Part B, Id.;

- Liability as to Rural Group related entities and individuals has been found to extend beyond the Sobar plant based on evidence of extensive wrongful conduct and patrimonial confusion, see supra factual background Part B, **(Exhibits H, I & J)**; and

- The settlement agreement proposed by Ms. Rabello has been rejected on appeal and is of no effect in the Brazilian Bankruptcy Court proceedings. see supra factual background Part B, **(Exhibits H, I & J)**.

CFJB's contention that "there is a substantial question as to whether, under American practice and policy,[27] it could ever be said that Securinvest or Ms. Rabello were part of a 'common economic group' with the Petroforte Group," Motion at 16, is nothing more than speculation with no basis in fact and similarly fails. Indeed, various courts in Brazil have found that the extensive transactions and chain of ownership interests shown to exist by entities and individuals related both to the Petroforte Group and the Rural Group support the existence of a "common economic group" based on principles of, *inter alia*, piercing the corporate veil. see supra, passim. CFJB offers no substantive basis for such a contention and none exists.

And, even if there were an appeal pending in Brazil as to any of the foregoing points, CFJB does not and cannot contend that any stay is currently in effect as to these findings at the

---

[27]     CFJB does not even contend that Securinvest or Ms. Rabello are U.S. citizens, residents, or domiciliaries. How a Brazilian court order applying Brazilian law to non-US parties could ever be manifestly contrary to the public policy of the United States is not explained.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Brazilian Bankruptcy Court level in the Petroforte Bankruptcy. The mere pendency of some alleged appeals does not support a denial of recognition now. See In re Gerova Fin. Garoup, Ltd., 482 B.R. 86, 94 (Bankr. S.D.N.Y. 2012) (pendency of appeal as to foreign liquidation order did not prevent recognition as no such requirement is imposed by Chapter 15 and, should reversal ultimately occur, any prejudice would be cured by the requirement under § 1518 that the court would be so advised).

### iii. Dismissal of the Chapter 15 Case is Not Required on Public Policy Grounds under § 1506

CFJB contends that recognition under Chapter 15 is inappropriate here based on alleged violations of U.S. public policy under 11 U.S.C. § 1506. Motion at 16-18. According to CFJB, recognition of the Petroforte Bankruptcy (and the discovery sought in this case) is manifestly contrary to U.S. public policy because those proceedings "undermine[] non-debtors' [presumably Ms. Rabello's and Securinvest's] unqualified rights under United States law to avoid being involuntarily forced into an unaffiliated entity's bankruptcy proceeding." Motion at 18. CFJB is wrong.

Section 1506 provides that recognition or other relief may be denied under Chapter 15 "if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. In utilizing the term "manifestly," Congress intended that this provision be interpreted restrictively and "invoked only under exceptional circumstances concerning matters of fundamental importance to the United States." In re British American Isle of Venice (BVI), Ltd., 441 B.R. 713, 717 (Bankr. S.D. Fla. 2010) (rejecting public policy challenge to recognition based on allegations of alleged procedural unfairness of foreign proceedings due to purported conflict of interest and confidentiality order with another creditor when complaining party was afforded right to appear and defend in foreign proceedings and, though conflict of interest may

lead to disqualification under U.S. law, it did not under BVI law) (cited by CFJB).  Relevant considerations are "(1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of foreign main proceeding under Chapter 15 would 'severely impinge the value and import' of a ***U.S. statutory or constitutional right*** such that granting comity would 'severely hinder United States bankruptcy courts' abilities to carry out . . . the most fundamental policies and purposes' of these rights." Id. (internal quotations omitted); see also In re Fairfield Sentry Ltd., 714 F.3d 127 (2d Cir. 2013) (public policy exception inapplicable based on argument that BVI proceedings were cloaked in secrecy and under seal as such confidentiality does not offend U.S. public policy, party had right in BVI to seek leave to access sealed documents, and "unfettered public access to court records is [not] so fundamental in the United States" as to justify denial of recognition); In re Millard, 501 B.R. 644 (Bankr. S.D.N.Y. 2013) (rejecting § 1506 challenge based on stay of judgment and potential rejection of default judgment for unpaid taxes by Cayman court as not subject to public policy exception when, *inter alia*, similar laws applied under U.S. law and bad faith in allegedly seeking to avoid judgment, even if it could be found, was not ripe for consideration).

Here, CFJB does not contend that its "other clients" have been deprived of procedural due process in the Petroforte Bankruptcy, nor could it as evidenced by the extensive appellate and other remedies of which its clients have availed themselves, albeit unsuccessfully, in Brazil.[28]  CFJB has not shown that any particular U.S. statutory or constitutional right has been

---

[28]    CFJB's reliance on In re Sivec SRL, 476 B.R. 310, 324-26 (Bankr. E.D. Okla. 2012) is misplaced for this reason alone.  Id. (denying request for comity as to release of retainage held by secured U.S. creditor when evidence demonstrated that U.S. creditor had not been afforded due process in Italian proceeding, notice and a right to be heard, and U.S. creditors would not be treated fairly or protected in Italian proceedings, in contravention of §§ 361 and 363 of the bankruptcy code, and §1501(a) (3), requiring protection of U.S. creditors, with no analysis of the applicability of the public policy exception under §1506).

violated here, not does it even contend any such right is implicated.[29]  Instead, CFJB's public

policy argument seems to be based on the differences between U.S. and Brazilian bankruptcy

law as to the extension of the bankruptcy to parties other than the initial debtor.

As an initial matter, it is well established that "the fact that application of foreign law

leads to a different result than application of U.S. law is, without more, insufficient to support

§1506 protection, . . . [as] the whole purpose of Chapter 15 would be defeated if local or

parochial interests routinely trumped the foreign law of the main proceeding." In re Qimonda

AG, 462 B.R. 165, 183-84 (Bktcy. E.D. Va. 2011) (denying motion to excuse trustee from

compliance with provision of Bankruptcy Code prohibiting cancelation of patent/licensee

contracts on public policy grounds when such provision was enacted by Congress immediately

following a decision allowing avoidance of such contract based on effect such avoidance would

have on American innovation and technology, thus evidencing the statute's great public

importance, the avoidance of which would impinge on a *statutory* protection fundamental to U.S.

public policy) (cited by CFJB);[30]  see also In re Gerova Fin. Group, Ltd., 482 B.R. 86, 94-95

(Bankr. S.D.N.Y. 2012) (rejecting § 1506 public policy objection to recognition notwithstanding

---

[29]    The cases cited by CFJB applying the public policy exception based on violations of U.S. statutory or other law thus are inapplicable. See Qimonda, 462 B.R. at 184-86 (termination of rights in contravention of specific U.S. statutory provision as against licensees of patents whose contracts were sought to be avoided); In re Toft, 453 B.R. 186 (Bankr. S.D.N.Y. 2011) (rejecting request for access to debtor's emails held on two internet service provider servers and to place a wiretap on such e-mail servers without giving notice to debtor as violative of the Federal Wiretap Act, the Privacy Act, and notice requirements under the Rules of Bankruptcy on §1506 grounds); In re Gold & Honey, Ltd., 410 B.R. 357 (Bankr.E.D.N.Y. 2009) (denying relief to creditor who, notwithstanding automatic stay imposed by U.S. proceedings and warning that proceeding abroad would be at his own risk, filed and prosecuted proceeding in Israel as an end-run around and in violation of § 362 automatic stay, a fundamental tenet of the Bankruptcy Code).

[30]    Qimonda was ultimately decided by the circuit court of appeals on grounds unrelated to Section 1506. See Jaffe v. Samsung Electronics Co., Ltd., 737 F.3d 1426, 28-29 (4th Cir. 2013).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

difference in law as to requirement under U.S. law that involuntary petition require at least three creditors while winding up at issue was commenced by one creditor, as permitted by Bermuda law).

In re: Rede Energia S.A., --- B.R. ----, 2014 WL 4248121 (Bkrtcy. S.D.N.Y. Aug. 27, 2004), is instructive. In Rede, parties sought to have recognition of the confirmation plan rejected on public policy grounds under § 1506 on the basis of alleged violative differences between U.S. and Brazilian bankruptcy law. The court, noting that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence," id. at 20, found that none of the issues complained of were "manifestly contrary" to public policy. Relevant here, the court held that the fact that a Brazilian court had allowed substantive consolidation of certain debtors for purposes of the recognition plan when a U.S. court would not have done so under U.S. law did not violate public policy based on the principal, among others that "it is not appropriate for this Court to superimpose requirements of U.S. law on a case in Brazil or to second-guess the findings of the foreign court." Id. at *22.

CFJB's public policy grounds on differences in law should thus be rejected as a matter of law on this basis alone. But, even if this Court were to consider the issues as to the differences in law more fully, an analysis of U.S. and Brazilian law demonstrates that extension of Brazilian bankruptcy to parties not initially considered debtors is not manifestly contrary to U.S. public policy as U.S. law provides for similar relief.

Under Brazilian bankruptcy law, the liabilities of a bankruptcy estate may be extended to an individual or entity, thereby making that person responsible with their own assets for the debts of the estate, where there has been "patrimonial confusion" of assets of the debtor with those of another person or entity. As such, if assets have been misappropriated from a debtor by a director

or shareholder or if there has been an abuse of the corporate form or bad faith by means of the diversion of assets, a Brazilian bankruptcy court may lift the corporate veil and extend the jurisdiction of the bankruptcy estate by ordering collection of any assets of any person who has been unjustly enriched by, or involved in, such wrongful activity. This can result in the bankruptcy estate having a right to collect the assets of individuals and entities who form a part of a common economic group with the debtor that has been involved with, or participated in, such activity through, among other things, piercing the corporate veil. For example, if two or more persons combine to siphon assets from the estate by fraud, Brazilian law would make the parties personally liable for the debts of the bankruptcy estate which was a victim of the fraud.

For example, on October 28, 2010, the Brazilian bankruptcy court decided that Katia Rabelo and Flavio Amaral, "[i]n light of the foregoing, I ALLOW IN FULL the application made by the trustee. I order that the legal personality of all the companies identified on page 102 be disregarded due to the clearly established link with the Petroforte Group, despite the fact that it has been noted that a number of these organizations have already been included in the winding up action. Their shareholders, directors, controllers and managers are declared to be liable for the irregularities found. I impose a freeze order to be placed on the assets of KATIA RABELLO AND FLAVIO BARBOSA DO AMARAL JUNIOR pursuant to Art. 40 Decree-Law no. 7661/45 and an extension of the effects of the winding up to both so that their assets shall be liable to meet the debts of the liquidated Estate.

Analogous concepts exist under U.S. law that would lead to a similar result. For example, in the U.S. bankruptcy context, non-debtor entities may be made a party to an existing bankruptcy through substantive consolidation. Substantive consolidation is proper when "(i) there is a substantial identity between the entities to be consolidated; (ii) consolidation [is]

necessary to prevent some harm or prejudice or to effect a general benefit; and (iii) the benefits counterbalance or outweigh the harms." In re Permian Producers Drilling, Inc., 263 B.R. 510, 516 (W.D. Tex. 2000); see also Kapila v. S & G Fin. Servs., LLC (In re S & G Fin. Servs. of S. Fla., Inc.), 2011 WL 96741 (Bankr. S.D. Fla. Jan. 11, 2011); In re S & G Financial Services of South Florida, Inc., 451 B.R. 573, 579-82, 585 (Bankr. S.D. Fla. 2011) (denying motion to dismiss on basis that this "Court has jurisdiction over non-debtor entities to determine the propriety of an action for substantive consolidation insofar as the outcome of such proceeding could have an impact on the bankruptcy case" and that the trustee in that case had satisfied his burden to demonstrate "a prima facie case for substantive consolidation) (citing numerous cases);[31] Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987). U.S. law similarly recognizes that non-parties may be made liable for the debts of another and constitute a proper defendant to an action when disregard the corporate form is appropriate due to its use as a means to a subversive end via piercing the corporate veil or alter ego theories of liability. See, e.g., 18 AM. JUR. 2D Corporations § 46 (2012).

In the context of the Petroforte Bankruptcy, the Brazilian Bankruptcy Court approved the extension of the bankruptcy to Securinvest, Turvo and Agroindustrial based on the fraud

---

[31]    See also In re E'lite Eyewear Holding, Inc., 2009 WL 349832 (Bkrtcy.E.D.Tex.) (granting motion to substantively consolidate non-debtor entities and reserving ruling as to whether, as to certain foreign subsidiaries, separate Chapter 15 proceedings would be required to effectuate consolidation); In re Alico Mining, Inc., 278 B.R. 586 (Bankr. M.D. Fla.2002) (concluding that the court had jurisdiction to consolidate debtor and non-debtor entities under its general equitable power); Bonham v. Compton (In re Bonham), 278 B.R. 586 (9th Cir.2000) (reversing district court order denying motion for substantive consolidation as to non-debtor entities) (citing Sampsell v. Imperial Paper and Color Corp., 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941)). Cf. In re: Richard J. Gladstone, 513 B.R. 149 (Bankr. S.D. Fla. 2014) (request "for a declaratory judgment that the defendants and their property are property of the estate in this case, based on a theory of alter ego, and the request for an order of substantive consolidation against entities that are not themselves debtors in bankruptcy" constituted core proceeding subject to determination by bankruptcy court).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

perpetrated on Petroforte through efforts of Securinvest, Banco Rural and others: "the disregard of a corporate veil of all affiliated companies is suitable and the Bankruptcy of Grupo Petroforte shall be extended to them due to the property deviation and undercapitalization which the Financial Group performed with the accomplice Mr. Ari Natalino including the management of Grupo Rural, since according to the Civil Code and Consumer Code the personal property of the defrauders is liable for the company's debt." 1782 case, DE69-3:14 **(Exhibit D).** In a subsequent appeal of that order, the STJ similarly found that the "extension of a bankruptcy and piercing of the corporate veil through which, in fraud cases, third parties are forced to respond with its own assets for the debt of the bankrupt company" was acceptable. S.T.J. Reg. No.2010/0134557-7, Relatora: Nancy Andrighi, 09.08.2011, p; see also Maira Magro, Valor, STJ declares Petroforte Bankruptcy, August 24, 2011 **(Exhibits K & L)**. These findings ultimately implicated, among others, Securinvest, Ms. Rabello, and a number of entities in the Rural Group of companies and individuals. Notably, here, the filing of this Chapter 15 proceeding, specifically as to Securinvest and related entities, was approved by court order of the Brazilian Bankruptcy Court and endorsed by the Public Attorney Office in the Petroforte Bankruptcy. DE 2, Exs. B-C.

> **iv.    No Basis Exists to Reverse Discretionary Relief granted to Trustee, Including the Right to Take Discovery Under Seal and Gag**

CFJB contends that the Court erred in granting discretionary relief to the Trustee under Chapter 15, specifically, discovery under seal and gag under § 1521, on the purported bases that the Court failed to ensure that CFJB's other clients were afforded "at least some protection" in asserting objections to the discovery and failing to account for differences between U.S. and Brazilian law as to the extension of bankruptcy. Motion at 19. CFJB contends that this Court thus violated the requirements of § 1522(a). Id. CFJB's contention constitutes a

misapprehension, if not misrepresentation as to the balancing that must be conduct as between ¶ 1521 and ¶ 1522.

Section 1521(a)(4) and (7) provides, in relevant part, that "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including . . . providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities . . . [and] any additional relief that may be available to a trustee." Section 1522(a) further provides that "[t]he court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.

Jaffe v. Samsung Electronics Co., Ltd., 737 F.3d 1426, 28-29 (4th Cir. 2013), cited by CFJB, is of assistance in understanding the interplay of the two sections. As the court explained, § 1522 (a) requires the bankruptcy court to balance the interests of both the creditors and the debtor" as to weigh the relative interests of "creditors and other interested entities, including the debtor,'" in the relief being granted. Id. (quoting 11 U.S.C. § 1522(a)). The Court in Jaffe did not impose a rule which required that all individuals and entities, however involved, such as CFJB's other clients here, must obtain "at least some protection," but rather, that, "as a prerequisite to awarding *any § 1521 relief* the court was *required* to ensure sufficient protection of the creditors and the debtor." Id. at 26 (emphasis in original)

SNP Boat Serv., S.A. v. Hotel Le St. James, 483 B.R. 776, 782-83 (Bankr. S.D. Fla. 2012), cited by CFJB, similarly is instructive. There, the court held that, while the court had discretion to ensure that the creditor, in that case foreign, was sufficiently protected in the

foreign proceeding under § 1522(a), ordering discovery as to the foreign proceedings related to such creditor to ensure fair treatment constituted an abuse of discretion because the court could not sit as the equivalent of an appellate court of the foreign judgment (though deposition of debtor was allowed). In explaining the interplay between §§ 1521 and 1522,[32] the court cited the Model Law for the proposition that, while local interests will often be those that are at issue in these proceedings, "*there is no justification for discriminating creditors on the basis of criteria such as place of business or nationality.*" Id. at 784 (quotations omitted) (emphasis in original). As such, the court found that the court "is not *precluded* from satisfying itself that the *foreign creditors'* interests are 'sufficiently protected'" in the foreign proceeding before allowing distribution of property, but that the court may inquire only into whether the foreign proceedings "generally are sufficient to protect creditors' interests," not the treatment of any single creditor. Id. at 784, 786; see also Tri-Continental, 349 B.R. at 636-37 (refusing to add additional conditions to the foreign representative's administration and realization of U.S assets, particularly as to administrative expenses, when what § 1522 imposes is the "need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another"); see also Toft, 453 B.R. at 196 n. 11 (citing in re Tri-Continental for proposition that "sufficiently protected" means that the court should balance the interests of the foreign representative and those affected by the relief in tailoring relief).

CFJB contends that, in the context of this case, the court was required to "evaluate conflicts" between U.S. and foreign law to balance the effect of the relief granted, the discovery

---

[32]    Section 1521(b), though not at issue here at this time, provides that the court may entrust distribution of assets, among other things, to the foreign representative so long as the "interests of creditors in the United States are sufficiently protected." The protection of such interest, unlike that at issue in SNP, is particularly to any U.S. creditor that comes to the court's attention.

under seal and gag, as between the Trustee and CFJB's other clients. First, CFJB does not cite any authority for the proposition that the Court is required, or even entitled to consider "conflicts" between domestic and foreign law. To the contrary, SNP, 483 B.R. 776, 784-86, upon which CFJB relies, supports the proposition that the Court is limited to considering the procedural fairness of the foreign proceedings and law generally, not as to the specific creditors before it. The law is actually to the contrary. See, e.g., In re Cozumel Caribe, 508 B.R. 330, 337 (Bankr.S.D.N.Y.2014) ("To inquire into a specific foreign proceeding is not only inefficient and a waste of judicial resources, but more importantly, necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where the creditors are always provided the proverbial 'second bite at the apple'").

Here, the discovery sought all pertains to bankrupted entities, i.e., Ms. Rabello and Securinvest, so any alleged "inequity" as to them by virtue of the extension, Motion at 19, is not subject to review by this Court. And, in any event, as demonstrated above at length, no showing has been made or exists that such extensions were not properly granted or that, in general, they are in any way contrary to U.S. law.[33]

As to the alleged relief for discovery under seal and gag, CFJB's argument that its other clients' interests were not considered because they were not give "at least some protection," Id.,

---

[33]     CFJB's reliance on In re Vitro S.A.B. de CV, 701 F.3d 1031, 2058-60, 1063-64 (5th Cir. 2012), is misplace. In Vitro, the Court refused to recognize a plan approved by the foreign court under which the debtor sought to release non-debtors, its subsidiaries, from their obligation on guarantees as to its debts that would otherwise inure to the benefit of all creditors, explaining, among other things, that the plan "did not provide for an appropriate balance among the interests of the debtor, its creditors, and the Guarantors [also creditors] under § 1521 and § 1522 such that interest of other creditors were not protected, as required by Chapter 15. Id. (also noting that plan was entered in contravention of previous order issued by new York court). CFJB are not alleged to be suffering the type of inequitable conduct presented in Vitro.

under § 1522(a) fails.  This court was fully aware of the requirements of Chapter 15 when it entered the Petition, which specifically made reference to Ms. Rabello and Securinvest, by way of the Recognition Order, granting relief under § 1521 for discovery concerning, *inter alia*, the Related Parties and their assets, etc.  CFJB has not pointed to anything in the record, in this Court's Order, or at all to the contrary.  The same is true as to the Orders on the Seal and Gag.

<strong>v.    No Basis Exists for this Court to Limit the Subpoenas</strong>

CFJB contends that the discovery at issue here, violates this Court's Order and § 1521 (a)(4) as requesting discovery beyond the scope allowed and that its other clients' privacy and confidentiality rights will be violated if the discovery is allowed.  Motion at 20-22.  CFJB is wrong on both counts.

Pursuant to § 1521(a)(4), the foreign representative is authorized to engage in discovery as to "information concerning the debtor's assets, affairs, rights, obligations or liabilities."  11 U.S.C. § 1521(a)(4).  Rule 2004 allows discovery as to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate."  In the ordinary course, Rule 2004 complements § 1521 and provides a procedural mechanism to obtain a subpoena.  <u>Glitner</u>, 2011 WL 3652764, *6. Thus, "[a]fter recognition, broad based inquiry into the debtor's assets and affairs is available under Fed. R. Bank. P. 2004 without the need to pursue a separate adversary proceeding or contested matter."  <u>British American Insurance Co. Ltd. v. Fullerton, In re British American Ins. Co. Ltd.</u>, 488 B.R. 205, 225 n.16  (Bankr. S.D. Fla. 2013) (cited by CFJB).  Here, this Court's Recognition Order further provides that discovery is available as to the assets, right, etc. "concerning" Petroforte and the Related Entities.  Specifically, the Recognition Order states that the "Trustee is authorized to examine witnesses, take evidence or seek the delivery of

54

information *concerning* the assets, affairs, rights, obligations or liabilities *of Petroforte and the Related Parties* without further order of this Court." DE 7 ¶ 9 (emphasis added).[34]

Furthermore, each of the 11 entities about which CFJB complains, as it well knows, "concern" the assets, affairs, rights, obligations or liabilities of Petroforte and the "Related Parties":

1. Arnage Holdings Ltd. ("Arnage"): Arnage is one of the two direct shareholders of Securinvest (Related Party), ultimately beneficially owned by Katia Rabello;

2. Brooklands Holdings Ltd. ("Brooklands"); Co-shareholder in Securinvest.  See supra No. 1 as to Arnage;[35]

3. Banco Rural a/k/a Rural Bank:[36] Ms. Katia Rabello (Related Party) was the president, controller and shareholder of Banco Rural (Mr. Meeks admitted at the Stay Hearing that Ms. Rabello was the principal of Banco Rural);[37]

---

[34]    In Glitner, unlike here, there is no indication that the discovery allowed extended to all that permitted under § 1521 "concerning" the debtor, here, unlike in Glitner, all of the "Related Parties'" assets, including their interest in other corporations, forms part of the Petroforte Bankruptcy.  See Glitner, 2011 WL 3652764 at 5-6 & n. 15 (allowing discovery as to assets of movants that were subject of a lien in foreign proceedings, but denying relief as to personal financial information of movants when they were not debtors in the proceeding or creditors of bank in the absence of a judgment and no other basis existed as to relevance of same to "the assets, affairs, rights, obligations, or liabilities" of the bank, to which discovery there was limited).  In this respect, Glitner supports the scope of the discovery sought by the Trustee here.

[35]    Evidence exists that, between Arnage and Brooklands, these entities wired $83,750,000 abroad from 2003 to 2005, which it is believed were diverted from the Estate.

[36]    The Central Bank of Brazil ordered the liquidation of Rural Bank after it failed to provide the Central Bank with an adequate financial recovery plan. The Central Bank is investigating the cause of the bank's financial problems and has the authority to penalize those responsible if irregularities are found. The insurance market regulator in Brazil intervened in the case with respect to the insurance companies owned by Rural Bank due to liquidity issues and the need to protect the insurance companies' clients.

[37]    Evidence exists that wire transfers from Agroindustrial Espirito Santo do Turvo Ltda. ($1,000,000) and Agricola Turvo Ltda. (1,700,000) ("Related Parties") were transferred to a subsidiary of Banco Rural in Uruguay January 2006.

4.  Construtora Tratex S.A.: Construtora Tratex S.A. (formerly Construtora Rabello) is a construction and engineering company founded by the grandfather of Ms. Rabello and which now is owned, in whole or in part, by Ms. Rebello beneficially;[38]

5.  Maria Aparecida Pessuto da Silva: Ms. Pessuto da Silva is a "Related Party" and has been since April 26, 2006, see certificate of clerk of the 18th Civil Court of Sao Paulo;

6.  Rural International, Inc.: Rural International, Inc., of which Ms. Rabello (Related Party) was the beneficial owner, was the branch in Miami of Banco Rural, again of which Ms. Rabello also was the principal, through which there is reason to believe that funds and/or their proceeds from the Estate have been paid.

7.  Rural Leasing S.A.: Rural Leasing S.A. (Brazil) of which Ms. Rabello (Related Party) was the beneficial owner, was the leasing company of Banco Rural, again of which Ms. Rabello also was the principal, and was the vehicle used to remove the ethanol plant from the Petroforte Estate.

8.  Rural Securities Inc.: Rural Securities, Inc. of which Ms. Rabello (Related Party) was the beneficial owner, was the brokerage company in Miami of Banco Rural, again of which Ms. Rabello also was the principal, through which there is reason to believe that funds and/or their proceeds from the Estate have been paid.

9.  Sabino Correa Rabello: Mr. Sabino Rabello is the late father of Ms. Rabello and also former president of the Rural entities. There is reason to believe that funds and/or proceeds thereof from the Estate have been diverted to offshore structures incorporated and managed by Mr. Rabello and Ms. Rabello.

10. Trade Link Bank: Trade Link Bank, as evidenced, inter alia, by discovery obtained in the § 1782 Proceedings, is ultimately beneficially owned by Ms. Rabello, along with Banco Rural.

11. Trapezio S.A.: Trapezio is the holding company through which Ms. Rabello holds her ownership interest in Banco Rural in Brazil, through which it is believed that funds and/or proceeds thereof from the Estate have been transferred.[39]

---

[38]   Evidence exists that Construtora Tratex S.A. wired $44 million to Safra National Bank of New York in 2001 and 2003, which funds are believed to have been diverted from the estate, and was the holder of the R$200 million in state notes that formed part of the settlement approved by the Brazil Bankruptcy Court in February 2012 (though later overturned by the .higher courts.

[39]   The Trustee has filed a motion with the Brazilian Bankruptcy Court in Brazil listing the investigation he would conduct in this case, including the identity of the Subpoena Targets here.

CFJB's argument as to its other clients' alleged privacy and confidentiality interests similarly are unfounded.  Motion at 21-22.  "A bank customer has no legitimate expectation of privacy in the contents of checks, deposit slips and other banking documents.  These records are not confidential communications but instruments of commercial transactions."  Clayton Brokerage Co., Inc. of St. Louis v. Clement, 87 F.R.D. 569 (D. Md. 1980) (citing United States v. Miller, 428 U.S. 435, 442 (1975) (financial records are not the bank customer's private papers, but rather, are the business records of the bank)).  In Transbrasil, 2014 WL 1655990, at *3, a similar argument was raised as to financial information.  The court there held that state privacy concerns were not implicated as federal law, which did not recognize that right, governed the dispute  and that bank customers have "no legitimate expectation of privacy in the contents of checks, deposit slips and other banking documents" as these "records are not confidential communications but instruments of commercial transactions."  Id.[40]

CFJB has not established that the financial records sought by the subpoenas, in this case as to brokerage and asset management entities, constitute confidential commercial information and have not made any factual showing that the records are confidential or proprietary.  To the extent that CFJB has made conclusory statements regarding purported private and confidentiality rights, these statements are insufficient to support the quashal of the subpoenas.  A "party must offer more than vague legal conclusions and speculations about the existence of a threatened

---

[40]    CFJB's reliance on British Am. Isle of Venice, 441 B.R. at 717, for the proposition that its other clients are entitled to review any potentially confidential or privileged documents is misplaced.  The Court there found that a confidentiality order between the primary creditor and the debtor in the main foreign bankruptcy proceedings did not violate public policy, with no discussion as to procedure to review discovery.  CFJB has not cited any authority supporting the right of its non-party clients to review the discovery being sought prior to production.  And, while that may be the case where privilege is implication, other than its use of that word in passing in one paragraph of its Motion, no such privileged documentation has been contended to exist here.

personal privilege to actually succeed on the motion" challenging a subpoena. <u>U.S. v. Gordon</u>, 247 F.R.D. 509, 510 (E.D.N.C. 2007) (internal citations omitted).

      WHEREFORE, the Trustee requests this Court to deny CFJB's motion, uphold the Seal and Gag provisions, and such other and further relief as this Court deems appropriate.

      Dated:  September 19, 2014.

              ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.
              *Counsel for the Trustee*
              1001 Brickell Bay Drive, 9th Floor
              Miami, Florida 33131
              Telephone:  (305) 372-8282
              Facsimile:  (305) 372-8202

              By:
                Edward H. Davis, Jr, Fla. Bar No. 704539
                E-mail:  edavis@astidavis.com
                Gregory S. Grossman, Fla. Bar No. 896667
                E-mail: ggrossman@astidavis.com
                Annette C. Escobar, Fla. Bar No. 0369380
                E-mail: aescobar@astidavis.com

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Case No. 14-15408-RAM

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2014, I filed a copy of this Motion under seal with the Clerk of the Court in accordance with the Seal Order and Local Rule 5003-1(D) and served a copy via e-mail to:

**Carlton Fields Jorden Burt, P.A.**
c/o Donald R. Kirk
4221 W. Boy Scout Blvd., #1000
Tampa, FL 33607
dkirk@cfjblaw.com

**Carlton Fields Jorden Burt, P.A.**
c/o Thomas Meeks
100 SE Second Street, Suite 4200
Miami, Florida 33131
tmeeks@cfjblaw.com

Annette C. Escobar

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.