```
 1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                     MIAMI DIVISION

 3

 4

 5

   IN RE:                     CASE NO. 14-15408-BKC-RAM
 6                            Chapter 15
   PETROFORTE BRASILEIRO DE PETROLEO
 7 LTDA.,

 8        Debtor in a Foreign Proceeding.
   _____/

 9

10

11               ECF# (62), (65), (66)

12

13               August 13, 2015

14

15        The  above-entitled  cause  came  on  for

16 hearing before the  HONORABLE ROBERT A. MARK,  one of

17 the Judges sitting in the  UNITED  STATES  BANKRUPTCY

18 COURT,  in  and for the SOUTHERN DISTRICT OF FLORIDA,

19 at  301  North  Miami Avenue,  Courtroom 4,  Miami,

20 Dade County, Florida, on Thursday,  August  13, 2015,

21 commencing  at or about 1:30 p.m., and the  following

22 proceedings were had:

23

24

      Transcribed from a Digital Audio Recording by:
25                  Margaret Franzen
```

1                  APPEARANCES:

2

3        ASTIGARRAGA DAVIS MULLINS & GROSSMAN, by
                GREGORY S. GROSSMAN, ESQUIRE
4            ANNETTE ESCOBAR, ATTORNEY-AT-LAW
                  on behalf of the Debtor

5

6

                   CARLTON FIELDS, by
7                DONALD R. KIRK, ESQUIRE
                  AVI KAUFMAN, ESQUIRE
8           ALEXANDRA D. BLYE, ATTORNEY-AT-LAW
                  on behalf of the Movants

9

10

                   ALSO PRESENT:

11

12            Rodrigo Kaysserlian, Debtor
     ECRO - Electronic Court Reporting Operator

13

14                - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We started digital recording,

2     so let me just advise you that the official

3     transcript is going to be based on the digital

4     recording, we have no live court reporters anymore.

5          So state your -- when you state your

6     appearances, spell your last name, and if there's

7     more than one attorney of the same gender at the

8     podium for some reason, we're going back and

9     forth, identify yourself each time you speak so

10    that the transcriber will know who's speaking.

11         With that, let's get appearances first

12    on behalf of the estate.  Come to the podium,

13    please.

14         MS. ESCOBAR:  Good afternoon, Your Honor.

15    Annette Escobar on behalf of the trustee on behalf of

16    the Petroforte estate from Astigarraga Davis; my

17    partner, Greg Grossman, from Astigarraga --

18         THE COURT:  You need to speak ---

19         MS. ESCOBAR:  -- Davis ---

20         THE COURT:  Stop, stop, stop.

21         MS. ESCOBAR:  Oh, I'm sorry.

22         THE COURT:  You need to --

23         MS. ESCOBAR:  Spelling.

24         THE COURT:  -- spell your name, and I guess

25    if you're going to refer to the name of the firm, you

1   should spell that, too.

2           MS. ESCOBAR:  Sorry.  Annette Escobar,

3   A-n-n-e-t-t-e-space-E-s-c-o-b-a-r; my partner from

4   Astigarraga Davis, A-s-t-i-g-a-r-r-a-g-a-space-Davis,

5   D-a-v-i-s, my partner, Greg Grossman,

6   G-r-e-g-space-G-r-o-s-s-m-a-n; and our client,

7   Rodrigo Kaysserlian, Rodrigo, R-o-d-r-i-g-o,

8   Kaysserlian, K-a-y-s-e --

9           UNIDENTIFIED SPEAKER:  S-s.

10          MS. ESCOBAR:  -- s-s-e-r-l-i-n.

11          UNIDENTIFIED SPEAKER:  A-n.

12          MS. ESCOBAR:  A-n.

13          THE COURT:  Let's do that one over again,

14  the last one.

15          MS. ESCOBAR:  Okay.  Rodrigo, R-o-d-r-o --

16  R-o-d-r-i-g-o, Kaysserlian, K-a-y-s-s-e-r-l-i-a-n.

17          THE COURT:  Okay.  All right, and for the

18  movants in the discovery motions and motion to

19  dismiss.

20          MR. KIRK:  Thank you, Your Honor.

21          Donald Kirk of the Carlton Fields law

22  firm on behalf of the movants.  With me today are

23  my colleagues, first, Alexandra Blye, who's also

24  with the firm --

25          THE COURT:  Spell ---

1          MR. KIRK:  -- B-l-y-e.

2          THE COURT:  And your name is K-i-r-k?

3          MR. KIRK:  Yes sir, K-i-r-k.

4          Ms. Blye had the unfortunate task of

5    reviewing the 25,000 documents, much of which

6    were in Portuguese, and she can address anything

7    about those documents.

8               And then Avi Kaufman, K-a-u-f-m-a-n,

9    also with the Carlton Fields law firm, and he's

10   here to address any inquiries you may have about

11   the underlying Brazilian action or the 1782

12   action, if that were to come up.

13          THE COURT:  Okay.  All right.

14          So this may wind up to be a preliminary

15   hearing in all respects because of the related

16   nature of the issues, but we have the motion for

17   protective order, Docket Entry 62, which was

18   filed, call it the first discovery motion, filed

19   July 10th, and that -- that one has been briefed.

20          Then a few days ago or last week, I

21   guess, we received the second discovery motion,

22   which is a motion to quash or for protective

23   order, Docket Entry 65, that was filed

24   August 6th, as well as a motion to dismiss that

25   was, I believe, also filed on -- on August 6th.

1        So obviously the -- the second

2   discovery motion and the motion to dismiss

3   haven't been briefed, but I believe I've read

4   enough and have enough background without the

5   responses to provide some rulings, preliminary

6   rulings, perhaps guiding principles that may get

7   us to a resolution of the various discovery

8   disputes, but until the motion to dismiss is

9   actually ruled on, I don't believe I would compel

10  discovery at this point, so we will -- we will

11  set that.

12        If there's any preliminary comments, I

13  guess I'll -- I could hear those if they go to

14  anything that's not in the papers, otherwise, I

15  may just jump in and tell you what I think about

16  all this.

17        MR. KIRK:  No, sir, we had a presentation

18  ready, but if you have comments, we know you're ready

19  for it, we're ready to address them.

20        THE COURT:  Okay.  Well, just so I'm

21  understanding this, the first motion, as I've called

22  it, Docket Entry 62, that one deals with documents

23  already produced by Espirito Santo Bank, Safra

24  National Bank of New York, and Citigroup, that have

25  not yet been reviewed by the trustee; and the second

```
1   motion deals with or requests protection from
2   discovery that has not yet been produced by the
3   institutions listed in the second motion, Docket
4   Entry 65, UBS Bank, Bitran & Associates, B-i-t-r-a-n,
5   and Standard Chartered Bank.
6               MR. KIRK:  Your Honor, those were also
7   produced, but ---
8               THE COURT:  You've got to get ---
9               MR. KIRK:  Sorry, sorry, sir.
10              THE COURT:  It's all right.
11              MR. KIRK:  Your Honor, those documents were
12  also produced, but the deadline to file any response
13  or motion for protective order did not fall until the
14  date that we filed those motions, sir.
15              THE COURT:  Okay.  So all of the documents
16  produced by the banks and institutions listed in the
17  two motions were the -- were documents that were
18  maintained under seal, essentially, and then reviewed
19  by your firm on behalf of the targets, and that's
20  what brings us here today.  Okay.
21              So at this point, you haven't seen
22  anything; right?
23              The trustee's side is agreeing.
24              MS. ESCOBAR:  Your Honor, one -- one
25  clarification on whether we have seen anything.  I
```

1  would like to clarify that prior to your order

2  preventing us from seeing any documents, the

3  Citigroup production had been made, as well as the

4  Safra production, so we had seen some of that, but we

5  stopped as soon as your order was entered.

6          THE COURT:  Okay, and then just -- just to

7  confirm that I'm on the -- on the right -- in the

8  right context here, the -- the movants include some

9  related parties as -- as that term has been defined,

10 essentially, part of the debtor entities for purposes

11 of the Brazilian case, that would include Katia

12 Rabella -- Rabello, and I guess Securinvest Holdings.

13          Are those the only two movants that are

14 actually debtors -- or that are actually related

15 parties?

16          MR. KIRK:  Yes, yes, sir.

17          THE COURT:  Okay.  All right.  So as to the

18 related parties ---

19          MS. ESCOBAR:  Your -- Your Honor --

20          THE COURT:  Yes.

21          MS. ESCOBAR:  -- could I clarify one small

22 thing?

23          As far as debtors and related parties,

24 other -- in addition to -- to Katia and

25 Securinvest, there -- the -- the other -- there

1    are other parties that have been bankrupted,

2    including -- I don't have the list right here,

3    but it's ---

4              THE COURT:  Well, I think -- but -- but I

5    think -- I'll -- I'll apologize for cutting you off

6    if there is more to say here, but I -- what I was

7    referring to were the movants in the two motions,

8    not -- not meaning to say that the only targets of

9    the various subpoenas are -- are those two.

10             MS. ESCOBAR:  The only clarification would

11   be that Banco Rural and Rural Leasing were -- are --

12   are bankrupt in a separate proceeding.

13             THE COURT:  In a separate proceed -- what

14   does separate proceeding mean?

15             MS. ESCOBAR:  Another bankruptcy under

16   the -- the Central Bank of Brazil.

17             THE COURT:  But that doesn't make them ---

18             MS. ESCOBAR:  Debtors or related parties

19   here --

20             THE COURT:  Yeah.

21             MS. ESCOBAR:  -- no.

22             THE COURT:  Okay.  So there -- there are

23   various other targets that are debtors or related

24   parties, but they're not amongst the movants.  The

25   only related parties that are movants are Katia

1    Rabello and Securinvest.

2            Okay.  So as -- as to those two, your

3    argument, I guess, in part, is let's wait on the

4    motion to dismiss because if you win, everybody

5    goes home, and if that -- and alternatively, that

6    we should stay any discovery, even as to those

7    two, because there's still an appeal pending, as

8    to whether -- and the -- and the -- a successful

9    appeal may eliminate their status as related

10   parties because it will -- well -- well, let me

11   stop in mid sentence.

12           The appeal that's pending is to

13   reinstate the settlement?

14           MR. KIRK:  Yes, sir.  As I understand it,

15   there was a settlement to effectively give back the

16   value of the assets subject of the -- the transaction

17   relating to the ethanol plant.

18           THE COURT:  Okay.

19           MR. KIRK:  There was ---

20           THE COURT:  So when the Bankruptcy Court

21   approved that --

22           MR. KIRK:  Correct.

23           THE COURT:  -- the -- if that order had

24   been maintained, neither Rabello, nor Securinvest

25   would have remained as related parties?

```
 1              MR. KIRK:  That's -- that's my
 2    understanding, and I think a little bit of background
 3    beyond that.
 4              In the 1782 action, discovery was
 5    stayed there, and then -- because of that
 6    litigation, and then that case was dismissed when
 7    the settlement was approved by the Bankruptcy
 8    Court.  It's now been appealed, it was
 9    overturned, and now there's an appeal of that
10    overturn.
11              THE COURT:  Yeah, but you're -- you're down
12    to the -- the last level of appeal; right?
13              MR. KIRK:  I believe so, yes, yes.
14              THE COURT:  Okay.  All right.  So, anyway,
15    just to -- to circle back.
16              So either -- either we should stay
17    discovery even as to the related parties because
18    your appeal would be successful or because you
19    think the case will be dismissed.
20              Now, as to scope of discovery or
21    production of documents dealing with Rabello and
22    Securinvest, are there issues or just those two
23    arguments for delaying --
24              MR. KIRK:  Your Honor --
25              THE COURT:  -- for protection.
```

1          MR. KIRK:  -- I mean, our primary argument

2    was what you just stated concerning waiting for those

3    two procedures to finalize.

4          In terms of scope, yes, we -- we have

5    some concerns about the duration.  There is no

6    time limit whatsoever.  We think that ought to be

7    limited, to some extent, but I think we're --

8    we're literally talking, perhaps, a hundred of

9    the 25,000 documents today.

10          THE COURT:  Okay.  So as to the parties

11    that are not related parties, although they may be

12    corporately familial, so to speak, they may somehow

13    be affiliated with related parties, parents,

14    brothers, sisters, children, grandchildren.

15          MR. KIRK:  Yes, and -- and I'm taking this

16    from -- as to the -- and I call them sort of the

17    non-debtors because the related parties are sort of,

18    in fact, debtors --

19          THE COURT:  Okay.

20          MR. KIRK:  -- so I call these the

21    non-debtor entities.

22          As to those, there are some allegations

23    in the response that there is some relation.  For

24    example, one of the non-debtor entities is a

25    shareholder of one of the debtors.  I'm not sure

1   how that turns it into an asset, but -- but, yes,

2   there are some loose connections, but they are,

3   in fact, not debtors.

4               THE COURT:  Do -- do you know, or does

5   anybody on your side know, whether there was efforts

6   to bring any of those entities into the web in

7   Brazil?

8               MR. KIRK:  Your Honor, I -- I don't know.

9   I am not aware of any efforts to bring them into the

10  web, which is one of the reasons why --

11              THE COURT:  Okay.

12              MR. KIRK:  -- we brought our motion.

13              THE COURT:  All right.  So whether it was

14  attempted or not, they're -- they're not presently

15  debtors or related parties?

16              MR. KIRK:  Correct.

17              THE COURT:  So as to those entities, are

18  you asserting no discovery is permissible or would

19  you acknowledge that they could at least ask, as you

20  would on any third-party discovery here, you could

21  ask for information re -- relating or regarding

22  transactions with debtors or related parties?

23              MR. KIRK:  That's exactly right.  Not no

24  discovery, but narrowly tailored discovery concerning

25  the debtor, the debtor's assets, or transactions with

1  the debtor --

2          THE COURT:  Okay.  Now when you --

3          MR. KIRK:  -- but not anything.

4          THE COURT:  -- you're using the word

5  debtors now, and maybe going forward, we can include

6  debtors and related parties?

7          MR. KIRK:  Right, right.  The 350-odd

8  entities consumed into this Petroforte bankruptcy.

9          THE COURT:  Okay.  So it really goes to

10  discovery requests that asks for just bank records or

11  other financial information of these, I'll call them

12  third parties, without tying the request to any

13  transactions with the debtors?

14          MR. KIRK:  Correct.

15          THE COURT:  Okay.  Anything so far,

16  Ms. Escobar, that I seem to be not -- not

17  understanding?

18          I don't mean it quite like that, but

19  anything in this -- in the dialogue that you

20  would disagree with as far as --

21          MS. ESCOBAR:  No, Your Honor.

22          THE COURT:  -- those general principles?

23          Okay.  All right.  So let me tell you

24  what I believe will -- some of these I think

25  really could be considered rulings, and then

1   principles to be applied if the motion to dismiss

2   is -- is denied.

3        The first one is that I do not intend

4   to stay discovery pending the outcome of the

5   appeals in -- in Brazil.  I think I referenced in

6   the prior order, the -- the big order on the seal

7   and gag provisions, the April 20th order, that

8   basically while there are appeals currently

9   pending, as it stands now, the Petroforte --

10  Petroforte estate encompasses Katie -- Katia

11  Rabello, R-a-b-e-l-l-o, Securinvest,

12  S-e-c-u-r-i-n-v-e-s-t, and all the other parties

13  that were -- were brought in and identified as

14  related parties.

15        So absent a stay in Brazil, and I don't

16  know whether it's been asked for, but certainly

17  nobody has told me it's been entered, if the

18  Brazilian Court hasn't stayed discovery pending

19  appeals, I see no reason to stay discovery here.

20        And I note there's an argument as to,

21  well, this is the final level of appeal and it's

22  unlikely, but I'm not really getting into the

23  likelihood of success, I'm just finding that the

24  pendency of that appeal doesn't provide cause for

25  a stay.

1              Second, I've -- I've reviewed the

2    motion to dismiss, I'm familiar with some of the

3    cases.  I was starting to go back to reread, I

4    believe it's Toft, T-o-f-t, is that the correct

5    spelling, which dealt with wire tapping, and I

6    looked at what I guess is dicta in the Vitro

7    case, V as in Victor-i-t-r-o, but I just don't

8    see it as even close to being within the 1506

9    exception based on all the cases uniformly

10   talking about it being a very narrow exception.

11             So I -- it doesn't mean, Mr. Grossman,

12   your side shouldn't brief it, because the other

13   side is pretty good, as you know, in oral

14   argument, so anything could happen when we set

15   it, but I -- I think the -- my view is the motion

16   to dismiss will likely be denied.

17             What we're talking about is allowing --

18   whether allowing the Brazilian trustee to take

19   discovery relating to parties that have been

20   brought into the Brazilian case, is manifestly

21   contrary to U.S. public policy based on the

22   arguments that the rules and procedures, and I

23   guess maybe substantive law that allowed these

24   entities to be brought in, is different from the

25   laws that apply here with respect to involuntary

1   bankruptcies and substantive consolidation.

2          I don't know that this could even be

3   attempted, but I would distinguish, for example,

4   if -- if this Court was being asked to bring --

5   somehow bring new entities into the bankruptcy

6   case by applying Brazilian law, I think that

7   might be a different story, but these parties are

8   already in.

9          There's numerous cases that have found

10  that Brazilian bankruptcies generally are

11  afforded comity.  There's lots of cases that talk

12  about the procedures not having to be identical,

13  I forget the name of the case, but one of the

14  cases that said to the effect that in Canada you

15  wouldn't get a jury trial, doesn't mean that --

16  that the determination of certain rights under

17  Canadian law is manifestly contrary to U.S.

18  public policy, even with the -- the fundamental

19  nature of -- of jury trial rights.  So I -- I

20  don't see much hope for the -- for the motion to

21  dismiss.

22          As I said, since this hasn't -- I'm not

23  ruling on it today, I'm not going to compel

24  discovery, but if, as I expect, the motion to

25  dismiss is denied, then -- then we're back to the

1   issue of maybe some, as you said, minor scope

2   issues in terms of timing on -- on the related

3   parties, and then issues relating to the -- to

4   the third parties.

5           So as to the debtor and related

6   parties, assuming the motion to dismiss is

7   denied, and based on my ruling that I'm not going

8   to stay discovery because of the appeal, then

9   we're really looking at the 2004 principles as to

10  scope of discovery, what -- what's overreaching,

11  what's burdensome and -- and so forth.

12          I know some of the case law, and I

13  think you argued some of that is there's courts

14  that have said 1521 is, perhaps, slightly more

15  restrictive in scope than 2004, but I believe the

16  actual orders entered in this case have

17  authorized discovery under 2004.

18          And if there's a split in law, I'm --

19  I'm of the mind that the same principles would

20  apply in determining scope, but it doesn't sound

21  like there's going to be major argument because

22  there's not a lot of documents apparently as to

23  Securinvest and Ms. Rabello.

24          So that really takes us to what might

25  be the heart of what's left, and that's the

1    targets that are not related parties, and

2    Mr. Grossman and Ms. Escobar, my view here is

3    that they be treated like any third parties.  I'm

4    not going to get into sort of the nuances of what

5    is the relationship between some of these third

6    parties and some of the parties that have been

7    brought into the -- into the bankruptcy.

8            They're not in.  Nobody would suggest

9    the Brazilian Court has used a -- a small net

10   in -- in what's been brought in.  So these, to

11   me, for purposes of analyzing discovery, would

12   have to be treated as any other third party.

13           Now, it doesn't mean it's irrelevant

14   what the relationship is, because the

15   relationship of these entities -- these third

16   parties to the debtor targets may lead to proof

17   or may -- there may be proof you already have of

18   transactions or arguments for why certain

19   financial information of these third parties

20   should be produced.

21           But my -- my sense now, and we can talk

22   about this, perhaps, a little bit in the time we

23   have today, is -- is that, as indicated in my

24   discussion with Mister -- Mr. Kirk, you have to

25   start with getting information that relates to

1    the debtors, transactions that occurred between

2    any of these parties and the debtors, or make

3    some showing based on -- on the record, that

4    these other financial documents that you're

5    asking for are -- are related to the financial

6    affairs of -- of the debtor.

7              And so I guess where I was hoping to go

8    with all this, was just to do a briefing schedule

9    on the motion to dismiss, set a hearing out.  I'm

10   going to be out for a while in September, so it's

11   probably going to be probably 45 or 50 days,

12   probably sometime in early October that we -- we

13   would be back to get this finalized.

14             And if -- if with these rulings or

15   principles in mind, the parties can't reach

16   agreement on discovery, then I do think,

17   Mr. Kirk, we have to go back to what I believe

18   was a winning argument by the trustee, which is

19   that you really haven't -- other than your broad

20   arguments, no discovery because of the appeal and

21   motion to dismiss, you really haven't focused on

22   which specific requests are appropriate or

23   inappropriate.

24             In fact, I -- I don't think, but I

25   don't claim to have clicked on every exhibit, but

Page 21

1    I don't even know if we have the subpoenas

2    attached to your motions, do we?

3              If -- if you could come up.

4              MS. BLYE:  Sure.  Good afternoon, Your

5    Honor.  Alexandra Blye.

6              In the -- we did not attach the

7    subpoenas to the motions, but we did go through

8    in the motions, I believe it was on about Page 11

9    of each motion, and just to let Your Honor know,

10   basically, the motions are the same, except for

11   on Page 11 there's a description of the requests

12   made in the relevant subpoenas, and the documents

13   that we reviewed that were produced in connection

14   with those subpoenas.

15             And, essentially, we grouped them all

16   together because on -- there was, I think, about

17   17 requests, 17 or 18 requests in each subpoena.

18   They were all pretty much the same requests,

19   except for two specific requests that were in --

20   one in the Safra subpoena and one in the Espirito

21   subpoena.

22             But other than that, all of the

23   requests were the same, and they always asked for

24   any and all documents, basically, on a certain

25   thing, whether it was bank statements or just

1   financial records.  They never were specifically

2   tied to records of the individuals and entities

3   listed in the subpoenas in connection with the

4   debtors.

5           It just said, pretty much, any and all

6   documents or financial records relating to the

7   entities and the individuals listed in the

8   subpoenas of which, as we pointed out, many of

9   those are non-related parties under the

10  recognition order.

11          So we didn't get into each request one

12  by one because we felt that it was possible to

13  kind of just group them all together, and that if

14  we are going to produce discovery as to the

15  non-related parties, certainly the only thing

16  that would be relevant would be those

17  transactions or assets, as Your Honor pointed

18  out, that are in connection with the debtor.

19          And I'll represent to Your Honor, I

20  reviewed the 25,000 documents to see which, if

21  any, referenced any of the related parties or

22  non-related parties that were listed in the

23  subpoenas.  As Mr. Kirk pointed out, only about a

24  hundred pages referenced the related parties and

25  those documents were never in the context of

1    transactions with the non-related parties.

2              So we didn't come across any documents

3    in the 25,000 that showed or had information

4    about transactions between the non-related

5    parties and the debtor entities.

6              THE COURT:  And just -- just generally or

7    you can go into some specifics, what -- what are the

8    documents?

9              MS. BLYE:  Sure.  So the majority -- the

10   great majority of the documents came from Citigroup,

11   I think they produced about 18,000 pages, and then

12   the other majority of the documents came from

13   Standard Chartered Bank, in which they produced

14   almost 6,000.

15             Of those two groups of documents,

16   almost all of them were pretty much wire transfer

17   details or transaction confirmation details, so

18   simply showing origination of -- from one bank to

19   another, or one party to another, and the amount

20   of the transfer.  That's pretty much what the

21   majority of the documents are.

22             The other documents ---

23             THE COURT:  Well, let me just stop there --

24             MS. BLYE:  Sure.

25             THE COURT:  -- for a second, and your --

1   your proffer, based on your review, is that the other

2   party to the transfers, to the extent -- I'm assuming

3   one of the parties was one of the non-debtor

4   entities, none of the debtor entities were the --

5   were parties to these transfers?

6           MS. BLYE:  Your Honor, I would have to go

7   back and double check them to be absolutely sure, but

8   my recollection of it is that most of the time when

9   it came up in context with one of the related

10  parties, there wasn't also a non-related party that

11  was a listed entity or individual on the subpoena, as

12  part of that detail.

13          If there were documents that involved

14  the non-related parties, it usually involved

15  transactions between two non-related parties or a

16  third party that wasn't even listed as an entity

17  or individual on the subpoena.

18          THE COURT:  Okay.  But conceptually, I

19  think Mr. Kirk has -- has agreed, that if there were

20  any wire transfers between any of these non-debtors

21  and any of the debtors, that that would be

22  discoverable.

23          MS. BLYE:  Yes, I -- I think we agree that

24  if it related to a debtor or related party of the

25  debtor, that may be discoverable provided the scope,

1    time, those things are somewhat limited, and as

2    Mr. Kirk said, there was only about a hundred pages

3    of documents.

4              And I can even be a little bit more

5    specific, Your Honor, the hundred pages of

6    documents, there were about -- so nine pages were

7    revolving around Flavio Amaral, and those came

8    out of the Citigroup ---

9              THE COURT:  Wait, who's that?  Can you

10   spell that?

11             MS. BLYE:  Sure.  F-l-a-v-i-o, Amaral,

12   A-m-a-r-a-l, and there were two pages of documents

13   relating to him in the Citigroup production.  There

14   were seven pages of documents relating to him in the

15   Standard Chartered production.

16             Then as to Secure ---

17             THE COURT:  Who is he?

18             MS. BLYE:  He is an employee, I believe, of

19   one of the Rural group entities.  Mr. Kaufman might

20   be a little bit more specific.

21             UNIDENTIFIED SPEAKER:  (Inaudible.)

22             MS. BLYE:  Yes, so ---

23             UNIDENTIFIED SPEAKER:  (Inaudible.)

24             MS. BLYE:  Yes, so ---

25             THE COURT:  Rural, R-u-r-a-l, group, is

1   that what you were ---

2          MS. BLYE:  Wasn't he specifically with

3   Trade Link, do you know?

4          UNIDENTIFIED SPEAKER:  (Inaudible.)

5          THE COURT:  We can't hear you, but I guess

6   it's not going to be on the --

7          MS. BLYE:  He's ---

8          THE COURT:  -- record.

9          MS. BLYE:  He's an employee and one of the

10  members of the Rural group, and those group of

11  entities.

12         THE COURT:  Okay, and then I think you were

13  going to, perhaps, tell me about the rest of the

14  hundred pages or ---

15         MS. BLYE:  Sure, and -- and also just to

16  add as to that, even looking at the transactions that

17  were involved, they were for approximately, between

18  all of those seven or nine pages, about a hundred

19  thousand dollars in different transactions in the

20  aggregate.

21         Then the other documents were ones as

22  to Securinvest, and those came from the Espirito

23  production.  There were 62 pages, which related

24  to account forms, corporate documents, a -- there

25  was a one-page bank account statement showing a

Page 27

1   zero balance bank account, and then there was a

2   wire confirmation for a loan from Espirito to

3   Securinvest.

4           THE COURT:  Okay.  So if the motion to

5   dismiss is denied, those hundred pages will be

6   produced, am I understanding correctly?

7           MS. BLYE:  I mean, I think we were still

8   arguing that even as to some of those, they go pretty

9   far back, almost, I think, some of them, ten years or

10  more, and I think ---

11          THE COURT:  Well, the -- the bankruptcy is

12  over ten years old.

13          MS. BLYE:  Yes, at this point, the

14  bankruptcy has been pending a long time.  So I -- we

15  did have, I think, some arguments about whether the

16  scope was reasonable, but ---

17          THE COURT:  Okay.  But that --

18          MS. BLYE:  -- that's the main pool of

19  documents.

20          THE COURT:  -- that could probably be

21  worked out or -- or argued quickly at the next

22  hearing.

23          All right.  So I think maybe,

24  Ms. Escobar or Mr. Grossman, whoever is going to

25  argue, it's really -- unless was -- was there

1  more you were going to tell me about detail or

2  that pretty much covered ---

3          MS. BLYE:  There -- I'll just -- so Your

4  Honor has the full scope of how many documents were

5  involved, the only other documents that we didn't get

6  to were 27 pages produced by Standard Chartered

7  relating to Securinvest.  Those only concerned --

8  those concerned intercompany transfers and interest

9  payments on loans to other banks.

10         And then there was one page of document

11 produced in connection with All Sugar, another

12 one of the related parties, that was produced by

13 Standard Chartered, and, again, that was

14 concerning an intercompany transfer of a wire

15 detail, and that's it.

16         THE COURT:  Okay.

17         MS. BLYE:  Thank you, Your Honor.

18         THE COURT:  All right.  So, Ms. Escobar,

19 either based on what you think is in the record

20 somewhere already, or what you could maybe, more

21 specifically, refer to if there was any supplemental

22 filings here, what -- what is there that you already

23 know about the non-debtor targets that you think

24 would justify produce -- just wholesale production,

25 so to speak, of all of their financial records,

1   whether or not they indicate any transactions with

2   the debtors?

3            MS. ESCOBAR:  Well, Your Honor, I -- we

4   would have to go entity by entity.  There's --

5   there's ten entities that fall under -- under that

6   description.

7            Just to give you one example of -- of

8   what we have, for example, is Brookland,

9   B-r-o-o-k-l-a-n-d, and Arnage, A-r-n-a-g-e.

10  Those two companies are owned by Katia Rabello,

11  K-a-t-i-a, Rabello, R-a-b-e-l-l-o, and those two

12  companies, in turn, own Securinvest,

13  S-e-c-u-r-i-n-v-e-s-t.

14           And, Your Honor, that -- that structure

15  was the very subject of the cover up that

16  occurred in Brazil, as far as the

17  misrepresentations made to the Brazilian Courts

18  relating who -- to who was the ultimate

19  beneficial owner of these companies.

20           And, Your Honor, the other thing that I

21  think that -- in respect of all the companies in

22  this list that are part of the Rural Group, there

23  is extensive orders in the Brazilian Courts,

24  which are valid to this day, which have found the

25  common economic group between the Rural group and

1    the Petroforte estate.

2              We have a difference of opinion on that

3    point.  We believe that the orders speak for

4    themselves as far as that finding in Brazil.

5              THE COURT:  What -- what does that mean,

6    common economic group, they haven't been brought into

7    the bankruptcy or as to some of those entities, is it

8    because they're -- they're -- they're in separate

9    proceedings?

10             MS. ESCOBAR:  Some of them are in separate

11   proceedings.  For example, the -- the -- Banco Rural,

12   which I explained before, is -- is mentioned

13   repeatedly in these -- in these orders as being

14   patrimonial confusion and common economic group with

15   the Petroforte estate, but because it's governed by

16   the -- the Central Bank, it has its own -- its own

17   liquidation.

18             But that's a very good example, for

19   example, because Banco Rural is at the very

20   center of a lot of these transactions.  There's

21   evidence in the record that with respect to Banco

22   Rural, loans were made between it and

23   Securinvest, whose bankruptcy is now final, short

24   of the -- the appeal on -- on the settlement

25   agreement.  They are completely bankrupted,

1    Securinvest.   There's no further remedy as to

2    them.

3          The Banco Rural, also there was certain

4    transactions in which some of the -- the

5    Petroforte companies were given as guaranties for

6    loans from these other Rural group companies.

7          I don't have a full listing of -- of

8    the type of -- of transactions that show that all

9    these companies formed a -- a significant web

10   of -- of transactions and -- and fraudulent

11   transfers that needs to be separated out, and we

12   cannot do that and -- and -- without looking at

13   the financial records to see what happened here,

14   and that is -- it has been the subject of orders

15   in Brazil.

16         THE COURT:  Can you be more specific?  Do

17   you mean that the Brazilian Court, to the extent of

18   subpoena powers of that court, has authorized broad

19   financial discovery of these non-debtors?

20         MS. ESCOBAR:  They -- in the order

21   reversing the settlement agreement, one of the things

22   that the Court there said, is that they were refusing

23   to stop discovery, both in Brazil and abroad, on the

24   interrelationship and the transfers between all these

25   various entities, in order to be able to determine

1  exactly what each of these entities did and did not

2  do.

3          And the Brazilian Court is well aware

4  of the targets against whom we are seeking

5  discovery here because when we requested leave to

6  file the Chapter 15 and the discovery, we

7  disclosed that to the Brazilian Judge.

8          THE COURT:  Okay.  But your answer was

9  phrased more narrowly than my -- my question and more

10  narrowly than the discovery.

11          You -- I believe you said that the

12  Brazilian Court in -- in orders or otherwise,

13  authorized discovery to get to the

14  interrelationship between the entities and

15  transactions, but that's -- that's a narrow --

16  that's narrower and closer to what I was

17  suggesting might be the appropriate scope than

18  authorizing production of all financial records

19  of -- of these parties.

20          So to your -- to your knowledge,

21  there's -- there's no order that, in Brazil,

22  authorized discovery that would include all of

23  the financial records of these non-debtors?

24          MS. ESCOBAR:  Well, there -- there was the

25  order authorizing the -- the filing of the Chapter 15

1   and our disclosure of these targets, but as far as --

2   as discovery as to all -- all financial records, I

3   think it would be more of a factually intensive

4   analysis as to each one.

5           THE COURT:  Are -- are these entities all

6   or mostly Brazilian?

7           MS. ESCOBAR:  Yes, all except two, Your

8   Honor.

9           THE COURT:  So has there been efforts in

10  Brazil just to get financial records of these

11  entities that exist in Brazil, banks or otherwise?

12          MS. ESCOBAR:  Yes, Your Honor.

13          THE COURT:  And has that been opposed or --

14  or -- or have there been disputes?  Has it been ruled

15  on?

16          MS. ESCOBAR:  If you can give me one

17  second?

18          THE COURT:  Yeah.  I mean, we don't -- we

19  don't necessarily need all the answers today.  This

20  may go to what -- what showing I may want you to make

21  in a supplemental -- well, you haven't responded to

22  the second discovery motion yet because it was just

23  filed, but in a supplemental response to the first

24  motion, and response to the second motion.

25          As you just said, it's -- it's -- it

1   may be a factually intensive and different issues

2   for different of these entities, but what you may

3   be able to state today is -- is fine, but I guess

4   it would be to -- to just lay out what -- what

5   actually has been allowed in Brazil.

6            MS. ESCOBAR:  Uh-huh.

7            THE COURT:  Because if the Brazilian Court

8   has said, go for it, we're not bringing these

9   entities in yet, but we agree they're sufficiently

10  related that you could get all of the financial

11  information about -- you can get all of their

12  financial information, broadly speaking, and then

13  sift through it and see if you could connect the dots

14  and -- and come up with theories to recover assets or

15  not, maybe that hasn't happened, I don't know, that's

16  what I'm asking, but do you want to just wait and

17  look into that rather than giving a partial answer?

18           MS. ESCOBAR:  Well, I -- I think -- I

19  think, Your Honor, that would be better because we --

20  we will be briefing it in any event, so I think that

21  that would be more efficient for everybody involved.

22           THE COURT:  Okay.

23           MS. ESCOBAR:  There's one thing that I

24  would address the Court, for one moment, related to

25  scope, if -- if it pleases the Court.

1              THE COURT:  Go ahead.

2              MS. ESCOBAR:  The scope that -- that the

3    movants have -- have requested that the discovery be

4    limited to, is two years from the date of the

5    petition.

6              As you know, this bankruptcy has been

7    ongoing since 2003 or 2001, depending on how you

8    look at it.  If the discovery were to be -- if

9    this Court were inclined to so limit the

10   discovery to two years before the bankruptcy --

11   the recognition petition here was filed, it would

12   essentially nullify all of the -- all of the

13   discovery because these actions and activities

14   that occurred go -- go significantly further back

15   into -- into the past.

16             And certainly we're not -- we don't

17   particularly seek documents before 2003, but to

18   the extent that banks still have documents that

19   far, which is -- they usually only have seven

20   years, but as the case may be, if -- if we're

21   going to limit it to two years before the filing

22   of the recognition, I mean, I think that that

23   would be a significant barrier to -- to going

24   further with this and spending further money on

25   these issues.

```
 1              THE COURT:  They want it to be two years
 2    before the recognition order in this 15, is that ---
 3              MS. ESCOBAR:  I believe so.
 4              THE COURT:  That doesn't make any sense.
 5              MR. KIRK:  Your Honor, I ---
 6              THE COURT:  Maybe that's a little harsh,
 7    but tell me why that makes sense, I guess.
 8              MR. KIRK:  We're going to check, Your
 9    Honor, but I think we said within two years of the
10    Brazilian recognition of it.  I mean, we can clarify.
11    As I understand it, we're going to be addressing all
12    of this --
13              THE COURT:  Yeah.
14              MR. KIRK:  -- at the motion to dismiss.
15              THE COURT:  But, I mean, it would seem that
16    with the history here, and -- and even though I ruled
17    in favor of the Carlton Field represented parties, or
18    Carlton Fields, in the seal and gag order --
19              MS. ESCOBAR:  Two years prior to the
20    service ---
21              THE COURT:  -- I did certainly make
22    findings and did not back off from reaching
23    conclusions or observations based on -- on the
24    history of wrongdoing, including that whole sham of
25    sorts regarding the owners of Securinvest.
```

1          MS. ESCOBAR:  Your Honor, I'm sorry, I was
2    able to find it in their papers.  It's at Page 8 and
3    17, and actually it's even more restrictive than what
4    I was representing.  It's two years prior to service
5    of the subpoenas.
6          MR. KIRK:  Yes, Your Honor, and I just
7    found it.  That is, in fact, what it says.  You know,
8    that -- that was our argument.  We recognize you have
9    some concern about that, we certainly would address
10   it at the appropriate time.
11         THE COURT:  How about now?
12         MS. ESCOBAR:  But Your Honor ---
13         THE COURT:  How about now?
14         MR. KIRK:  There has to be, in our view,
15   some time limit to the request, and recall that the
16   request that we were addressing, related to anything
17   at all relating to debtors and non-debtors.
18         So in order to potentially hedge
19   against a ruling that they could pursue
20   non-debtors, which we don't think they can, we
21   wanted to at least corral it in time because of
22   the expansive scope of these things.
23         So -- so that's the point of that being
24   in there, and, you know, we -- we had to put a
25   timeframe in there.  We recognize that there's

1    going to be debate against it, but -- but there

2    has to be, I think, in our estimation, some

3    collar on time, rather than back to the beginning

4    of humanity, which is what it presently says.

5             THE COURT:  But to the extent I determine

6    that particular requests for particular kinds of

7    documents are appropriate with respect to these third

8    parties, then it would seem that it should really

9    include documents for the time period starting from

10   or even a little bit before the -- the bankruptcy

11   because we're dealing with ten or 12 years of

12   history, which includes postpetition transactions.

13            I mean, these related parties, Rabello

14   and Securinvest, were brought in sometime during

15   the proceedings, I don't remember the year.  Once

16   they were brought in, if they transferred assets

17   or in contemplation of, perhaps, being brought

18   in, once the -- once the whatchamacallit, plant

19   transaction was -- that's p-l-a-n-t, once that

20   transaction was being litigated.

21            I don't see a good argument why it

22   shouldn't include the whole time period of the

23   bankruptcy, but as to the scope, that's where we

24   have to get into the more factually intensive

25   analysis as to what's in the record that would

1    entitle you to the broad financial discovery, and

2    when I say what's in the record, orders from

3    Brazil saying we're not bringing them in as

4    related parties, but you can take discovery about

5    all the financial dealings of Arnage or

6    Brooklands or ---

7              MS. ESCOBAR:  Right, Your Honor.  With

8    respect to the scope, I wasn't going so much to the

9    third parties, which I understand that we'll be

10   briefing, it was -- it was the time period.

11             And the one thing that I would like to

12   add, is that as far as the -- the -- the

13   objection on scope is related to undue burden or

14   expense, certainly they -- they don't really have

15   standing to raise that argument because they're

16   not being asked to do anything, it's the banks.

17   So it's as far back as whatever the banks can

18   produce, they have produced.

19             THE COURT:  No -- no sympathy for Ms. Blye

20   having to -- her burden of going through 24,000

21   pages?

22             MS. ESCOBAR:  Well, Your Honor, that might

23   be me once we get the doc -- if we get the documents,

24   so, you know.

25             THE COURT:  Okay.

1          MR. KIRK:  Your Honor, just -- you know,

2     maybe to -- to frame up times.  I looked back at our

3     motion to dismiss, and it's my understanding that the

4     entities that we represent that are part of this

5     bankruptcy, were put into that bankruptcy in 2007,

6     not 2001 or whatever the dates may be.

7          While we would love to have the time

8     limit as limited as possible and, in fact, two

9     years from the subpoena, we recognize that 2007

10     and a date close in time to that might be

11     something that you deem more appropriate.

12          THE COURT:  Well, the -- I mean, the --

13     the -- the lease back transaction of the ethanol

14     plant, going back to my summary of the facts in the

15     seal and gag order, that was all the way back in

16     2000.  I don't have a date in my opinion as to when

17     the action was filed to set it aside, but the parties

18     can talk, maybe that's an appropriate date.

19          I -- you know, just like in our typical

20     cases, you may -- you may be looking to what a

21     debtor did once there's been a lawsuit, not

22     necessarily what it did after the lawsuit was

23     successful.  So, but ---

24          MS. ESCOBAR:  Right, Your Honor, and it

25     would be our position that certainly once the --

1  the -- the -- the activity surrounding the Sobar

2  plant occurred, and was being carried out to syphon

3  funds from the Petroforte estate, which is our

4  position, that it was known that the Petroforte

5  estate was -- was in -- in financial trouble when the

6  Sobar transaction occurred, that anything around that

7  time, and certainly from the beginning of that

8  bankruptcy, would be relevant, that would be our

9  position, because as you say, those activities

10  underlying the Sobar transaction and other wrongdoing

11  by that group commenced before the bankruptcy.

12          THE COURT:  Okay.  All right.  So what

13  would be the subject of some further briefing would

14  be both arguments on each side as to timeframes, to

15  the extent the Court compels the production of

16  certain documents as being relevant, and then a more

17  specific showing, based on either facts in the record

18  from various orders or -- or -- or rulings that you

19  think tie these non-debtor third parties in

20  sufficiently to ask for broad discovery or more

21  specifically, and perhaps more convincingly, orders

22  from the Brazilian Court that allowed or authorized

23  or enforced, perhaps, subpoenas.

24          I mean, if we had subpoenas to

25  Brazilian banks for all these entities and they

1    were forced to produce the documents, then that

2    may -- that would certainly be very relevant.

3              Okay.  So just to go back for -- for a

4    step because I -- I know it's -- it's awkward and

5    you really can't just throw in the towel today,

6    Mr. Kirk, but I didn't go back and look at the

7    cases.

8              What -- just tell me what the best case

9    you think you have is to expand 1506 to this type

10   of situation.

11             MR. KIRK:  Your Honor ---

12             THE COURT:  Because one of the cases was a

13   365(n) issue, right, where they were specifically

14   dealing with trademark or license agreements that

15   would -- would -- would not be --

16             MR. KIRK:  Your Honor, I think ---

17             THE COURT:  -- rejected in bankruptcy, and

18   then Toft was a direct violation of U.S. wire tapping

19   laws, I think.

20             MR. KIRK:  Right.  Your Honor, I think that

21   we cited the best cases we found.

22             We accept the proposition, clearly,

23   that 1506 is extremely narrow, extremely

24   difficult, and is not applied often, and that

25   there is not much case law on it, in part,

1    because Chapter 15 is relatively new, and I don't

2    think there's a lot on it.

3            But what we think strongly, is that

4    given the proceedings in Brazil, and how starkly

5    different they are from the proceedings in the

6    United States to accomplish what they did, that

7    it ought to apply.

8            And there are no cases, as far as I can

9    tell, that deal with the facts and the law that

10   we're presenting, I mean, there just aren't, and

11   if there were, we certainly would have talked

12   about them.

13           You know, I think -- so in terms of the

14   law, 1506 says what it says.  The standard is

15   what it is.  It is as difficult of a standard as

16   there is, we understand that, and there's no law

17   on this point, and if there was, I think you'd

18   know it, and I think it would resolve this.

19           But what we're saying, Judge, is that

20   in this circumstance, where one transaction, one

21   transaction that was found to be a fraudulent

22   transfer of one person or one entity, and let's

23   say it's worth a hundred million dollars,

24   resulted without a finding of insolvency, and in

25   an ex parte proceeding in the involuntary

1    bankruptcy of an entity that potentially has

2    essentially more assets than the value of that

3    fraudulent transfer, and without any of the

4    substantive consolidation arguments that you have

5    in the United States.  It's just very different.

6               In the U.S., you do not involuntarily

7    bankrupt an entity and substantively consolidate

8    them without a finding of -- of -- of insolvency

9    or without a complaint and a trial, if necessary.

10   These are sort of fundamental U.S. rights in

11   terms of due process and the like.

12              So that's the gist of it, Judge.

13   There's no case, but that's the argument.

14              THE COURT:  Yeah.  I mean, well, there --

15   there are some courts that have substantively

16   consolidated non-debtors without a separate

17   involuntary proceeding.

18              I -- I guess your argument would be --

19   would be better, it may not still be a winner,

20   but it would be better, I suppose, if you were --

21   if the purpose of this proceeding was to freeze

22   and compel the turnover of assets of these third

23   parties that are located in the states to Brazil,

24   then -- then you're talking about something that

25   I think is one step further along in terms of

1   the -- the scope of the action, because it has to

2   be an action that is manifestly contrary.

3            So that's -- that's part of my

4   reasoning or reaction that this is weak, because

5   the -- the action that you're saying is

6   manifestly contrary is not turnover of assets of

7   these third parties, it's just discovery --

8            MR. KIRK:  Right, right, but ---

9            THE COURT:  -- so -- so that weakens it.

10           If it was turnover of assets, and I

11  think Mr. Grossman and Ms. Escobar would still be

12  arguing that -- that -- that that wouldn't be

13  manifestly contrary just because their Brazilian

14  procedures for bringing entities in is

15  different -- is different from ours, but it

16  would -- it would be a more extreme action, I

17  guess.

18           MR. KIRK:  Right, and I -- I understand

19  that, and I -- I guess part of this, Your Honor, is I

20  don't know what else is going to happen.

21           THE COURT:  Yeah.

22           MR. KIRK:  You know, this is -- you know --

23  and I -- and I -- we cannot hide, right, from the

24  findings or the briefings that have occurred in

25  Brazil.  Those are words that judges found and we

1    can't hide from them.

2         But -- but when we look at things, we

3    have an entirely different perspective of what

4    happened, which is there was one found to be

5    fraudulent transfer that occurred in the

6    insolvency of an entire enterprise that could

7    have value, substantially more than that

8    fraudulent transfer, and, in fact, the -- the --

9    the assets of that fraudulent transfer are

10   frozen, and if the settlement was approved, the

11   debtor is made whole.

12        But what's happened instead, is sort of

13   this, literally, the Pac-Man that just continues

14   to eat other entities, and -- and so when we look

15   at it from that perspective, I don't know what's

16   going to happen next.

17        And there is grave concern that this

18   thing just feeds itself, and continues to feed

19   itself, that's why we filed the motion, because

20   we think that that is a probability.

21        If it was just limited to discovery of

22   this hundred pages of documents, it probably

23   wouldn't be that big of a deal, I don't know, but

24   I don't know what -- what's next.

25             THE COURT:  There are two levels of appeal,

Page 47

1   though, that -- well, the first level of appeal

2   reversed the Bankruptcy Court order approving the

3   settlement and knocking Securinvest and Rabello out,

4   and then a second level of appeal, if I'm remembering

5   correctly.

6           So if the settlement was so reasonable,

7   if -- if the scope of the alleged wrongdoing

8   should have been limited to undoing the

9   transaction, what happened on those appeals?

10          Are you suggesting that the courts were

11  unfair or --

12          MR. KIRK:  Let me just address one thing,

13  and you're -- and, yeah ---

14          THE COURT:  -- and maybe it's a silly

15  question.

16          MR. KIRK:  I don't know, Judge.  But what I

17  do know is that the bankruptcy judge there, the one

18  sitting in your chair, found it to be reasonable, and

19  yes, it was appealed, and it was reversed on appeal.

20          I don't really know the details of it,

21  but at some point it will be a reality of what

22  the final decision is, but just because an

23  appellate court overturned it, it doesn't mean a

24  bankruptcy judge, that I think is well respected,

25  found it to be reasonable at one point.

**OUELLETTE & MAULDIN COURT REPORTERS, INC.**
**(305) 358-8875**

1          MR. KAUFMAN:  Avi Kaufman on behalf of

2   the movants, Your Honor.

3          Just one note that ---

4          THE COURT:  Go ahead, state your name

5   again.

6          MR. KAUFMAN:  Avi Kaufman on behalf of the

7   movants.

8          Just one note to add regarding the

9   Judge that made the finding that the settlement

10  was acceptable.  This is the same judge that

11  initially put Securinvest and Katia Rabello into

12  the Petroforte bankruptcy, and this is the same

13  judge that initially issued letters rogatory in

14  the Southern District of Florida seeking

15  additional discovery in the proceedings -- 1782

16  proceedings that have been discussed.

17          So this isn't a judge that was far

18  removed from the facts or far removed from the

19  parties, this is the Judge that initially

20  extended the bankruptcy proceedings and then

21  determined that it would be unjust enrichment to

22  extend them beyond Sobar, because Sobar was the

23  only transaction, after years, and years, and

24  years of searching, that was found to be an issue

25  in the scope of the bankruptcy and in the scope

1   of the proceedings we're talking about here, Your

2   Honor.

3            MR. KIRK:  So I think circling back to your

4   comment about the discovery in this case, and that

5   the discovery action itself is not so manifestly

6   contrary to U.S. law that you ought to ignore

7   recognizing the Brazilian bankruptcy, it's what I

8   don't know that's going to happen that is of greater

9   concern.

10           And fundamentally, it doesn't change

11  the fact that they're going after discovery

12  now -- it doesn't change the inherent

13  inconsistency in law between Brazil and the

14  United States about how an entity that is not

15  voluntarily wanting to be bankrupt, is put into

16  bankruptcy without any due process.  So I think

17  fundamentally, it's still different.

18           THE COURT:  Okay.  Mr. Grossman, if you

19  want to -- it's not -- it's neither here nor there in

20  terms of final resolution today, but did you want to

21  comment on the appeals and the ultimate outcome, why

22  it -- you don't think it was unreasonable to reverse

23  and keep these parties in?

24           MR. GROSSMAN:  I'm happy to.  I'm not -- I

25  can't say that I'm completely versed in all of the

1   details of it.

2           My understanding of the settlement

3   proposed to the bankruptcy judge, it wasn't

4   proposed by the trustee, it wasn't proposed by

5   the public prosecutor or the closest equivalent

6   we would have is the U.S. Trustee's Office, it

7   was proposed by the person who wanted to settle

8   to the Judge, and the Judge imposed the

9   settlement.

10          So if we're talking about what's --

11  what's -- what's strange and what's different

12  between Brazil and the United States, that would

13  be a very strange thing for Your Honor to impose,

14  a settlement on parties who haven't brought it in

15  and said that they've agreed, but that's neither

16  here nor there because that settlement doesn't

17  exist.

18          You take the case as you find it, I

19  think you've said that on the record in this case

20  before.  So I don't want to spend a lot of time

21  on that.

22          I -- I rose, Judge, for a different

23  purpose, which is let's -- let's get to the

24  logistics here.  I have concern, in light of Your

25  Honor's rulings, that now the estate is going to

1  spend monies with expert witnesses in having

2  conver -- you know, briefings and affidavits with

3  law professors to talk about what's the scope of

4  the Brazilian law on extension orders, and -- and

5  what is the -- you know, is it a multi -- is it a

6  nine factor test, and all of this kind of stuff,

7  which really, just for us, is throwing money into

8  a hole and burning it.

9           I suggest, Your Honor, that you had it

10 exactly right when you said the action that is

11 pending is discovery.  Mr. Kirk stood here and

12 told you that really this motion they filed is

13 kind of a stalking horse for what might come

14 after that discovery is produced, and that it

15 might lead to some further activity.

16          THE COURT:  When you say you're concerned

17 about the expense, are you -- you talking now about

18 briefing the motion to dismiss or are you talking

19 about ---

20          MR. GROSSMAN:  No, that's -- that's it.

21          THE COURT:  Okay.

22          MR. GROSSMAN:  That's it, because what I --

23 you said we're going to, you know, have a briefing,

24 it's going to go out until October.

25          I envision, and this is part of us

1    walking into the Court here, hearing what was

2    being talked about in the hallway was, well,

3    they -- what's in their papers is not all that

4    they would like to present.  They have additional

5    information they want to present, additional --

6    perhaps, an expert witness on the movants' side

7    on the motion to dismiss.

8                    THE COURT:  I don't ---

9                    MR. GROSSMAN:  No, they didn't say that to

10   you.

11                   THE COURT:  Oh.

12                   MR. GROSSMAN:  That's why I'm here to make

13   sure that when we get to the dates of briefs, that

14   Your Honor gets a clear picture of what we're going

15   to be doing.  Is it a paper response?

16                   THE COURT:  Yeah, it's just -- it's just --

17   I mean, I was expecting you just to do what I would

18   otherwise do if there was no further briefing, I'd go

19   back and read the handful of cases under 1506 to

20   satisfy myself that my preliminary view is correct,

21   and this would be an improper extension of 1506.

22                   MR. GROSSMAN:  And that's fine, Your

23   Honor --

24                   THE COURT:  I mean, you can do it ---

25                   MR. GROSSMAN:  -- because I ---

1          THE COURT:  -- you can do it in five pages,

2    probably.

3          MR. GROSSMAN:  Yeah, I identified at

4    least -- I tried to distill the motion to dismiss

5    down to what is it that we might have to have

6    presented to the Court.

7          One of the arguments is, they made a

8    due process argument that Ms. Rabello did not get

9    an opportunity to present evidence in opposition

10   to her extension.

11         In my view, whether she had an

12   opportunity or didn't have an opportunity, is

13   probably a question of Brazilian procedural law.

14   We would put that in our response.

15         I don't want this to turn into a final

16   evidentiary hearing on whether or not Brazil --

17   or a 44.1 under the Federal Rules of you having

18   to decide Brazilian law on that point.  If it is,

19   then so be it, but I would like to know what it

20   is and try and limit how much money we spend on

21   the way to what we think, from your tentative

22   view, is probably not a winning effort on --

23   on -- on the movants' part.  I just don't want to

24   spend gobs of money to get to the same place.

25         They've also suggested -- and I can't

1   figure out whether they're making an as applied

2   argument or an as stated argument, meaning is the

3   extension -- the extension of the bankruptcy to a

4   non-debtor, you know, the substantive

5   consolidation of a non-debtor entity as per

6   Brazilian law, whether that just period is

7   manifestly dis -- manifestly contrary or are they

8   saying, in this case it is manifestly contrary,

9   because that's two different things.  One is what

10   does the law say, and then the other one is,

11   well, the law as applied to the facts.

12          We think the facts have been found by

13   the Judge -- by the Judges in Brazil, and at that

14   point -- and I hope I'm not being too theoretical

15   here, but if there was -- for instance, if there

16   were four factors, and I'm -- I'm just being

17   hypothetical, there's four factors that would

18   then lead to an order of substantive

19   consolidation with a non-debtor entity, and the

20   Court found three of the four factors, and Your

21   Honor said, well, without the fourth, it would

22   be -- it wouldn't -- it would be manifestly

23   contrary.

24          But if -- what if they found six things

25   of which only -- in the recitation of the facts,

1   some of the things they found would be enough

2   even here, but it wasn't necessary to the ruling

3   in Brazil, that would be perfectly normal here.

4          For instance, if we found in our

5   regular substantive consolidation with a

6   non-debtor entity, if we found this commingling

7   of assets, you can't unscramble the eggs, those

8   kinds of things, which is one of our factors.  If

9   a court in Brazil found that, but it's not a

10  requirement under Brazilian law, that's as

11  applied, that's not as stated.

12         So I'm just trying to find out how it

13  is that we can narrow -- do as -- as cost

14  efficient a job in getting the response and

15  getting to the finish line on this point, so,

16  frankly, we can get some pieces of paper to look

17  at.

18         THE COURT:  Yes, you're being too

19  theoretical.

20         MR. GROSSMAN:  Great, great.  Five pages it

21  is, Your Honor.

22         THE COURT:  No, I mean, I -- I think it's

23  not -- I understand the distinction, and it -- but --

24  but based on my preliminary view, the crux of the

25  argument is -- doesn't get into that much detail.

1          I -- I think the -- as I expressed my

2    preliminary view, the fact that there are

3    different procedures for bringing non-debtors

4    into the estate that are different from our

5    procedures for substantive consolidation or

6    involuntary bankruptcies, is not -- does not

7    render the action of authorizing discovery of

8    parties brought in to be manifestly contrary.

9          So I think it's really spending a

10   little more time -- you know, I think when

11   Judge Gropper wrote Toft, that's G-r-o-p-p-e --

12   G-r-o-p-p-e-r, I believe, or one P.

13          MR. GROSSMAN:  Yes --

14          THE COURT:  Two Ps?

15          MR. GROSSMAN:  -- double Ps.

16          THE COURT:  You know, he said there's only

17   a few 1506 cases, and he discussed them, and so now

18   there's a few more, but -- but none of them would --

19   would seem to apply, in my view, to this type of

20   situation.

21          MR. GROSSMAN:  Okay.

22          THE COURT:  If it's easy to pinpoint

23   findings that were made that you think go even beyond

24   what would have been required under Brazilian law, I

25   guess you could -- you could -- you could point those

1    out as -- as well.

2          MR. GROSSMAN:  Thank you, Judge.

3          THE COURT:  All right.  So let's wrap it

4    up.  So the -- the Court will do a briefing schedule

5    and -- and set a hearing.  I was going to come up

6    with some hearing dates.  Let me just take a look at

7    October.

8          So I -- I guess it would be probably

9    during the first or second full week in October,

10   October 5th or 12th, I don't have a specific

11   date, but are any of the main players out of town

12   for either of those weeks that you know now would

13   be a conflict?

14         I'll get the order out in the next

15   couple of days, we could always move it.  It's

16   not that I'm that constrained, I just don't --

17   I've set a few things in the last couple of days

18   that wouldn't even show up yet necessarily on my

19   calendar.

20         MR. KIRK:  Your Honor, would it help if I

21   conferred with the trustee's counsel to find a couple

22   of days in those two weeks and then e-mail them to

23   your law clerk within the next 24 hours?

24         THE COURT:  Yeah, that -- that's fine.  I

25   mean, I think we'd probably be looking at -- hold on,

1    let me just check one thing.

2             Well, how does the afternoon of

3    October 7th look?  That's a Wednesday, I think.

4             MR. GROSSMAN:  As the only person with a

5    hard copy calendar in his hand, this is

6    Greg Grossman, it's fine by us, Your Honor.

7             THE COURT:  Do you want to pull out your

8    Rolodex and call your office just to confirm?

9             MR. GROSSMAN:  I have the big cell phone,

10   too, it's like four feet long.

11            THE COURT:  Either that or, I mean, because

12   I'm going to be away for a chunk of time, so I may

13   set hearings on Friday, too, so the 9th may be a

14   possibility, too.

15            MR. KIRK:  Your Honor, the 7th is -- is

16   clear for us.

17            THE COURT:  Okay.  All right.  So let's --

18   let's plan October 7th at -- at 2:00.

19            Then the only thing might be sequence.

20   The sequence is -- is standard for a motion to

21   dismiss, I'll have a response and a reply.

22            As to discovery, while I was initially

23   focusing on the request, from what Ms. Blye said,

24   unless you disagree, Mr. Grossman or Ms. Escobar,

25   if they were broadly stated, then maybe we don't

1    need to parse the -- the -- well, I guess you

2    should do a notice -- why don't you do a notice

3    of filing, at least, of the -- of one of the

4    subpoenas, just so I can see --

5              MR. KIRK:  Yes, sir.

6              THE COURT:  -- how the requests are framed.

7              And then, otherwise, the burden will be

8    on the trustee to present some briefing on

9    third-party discovery that goes beyond just

10   transactions with the debtors, and that could be,

11   as I said, facts in the record, findings in

12   orders, or the most helpful, perhaps, would be

13   actual discovery orders from the Brazilian Court

14   authorizing that broad type of discovery.

15             Okay.  I think that will do it.

16   All right.  Thanks.

17             (Thereupon, the above-proceedings were

18   concluded.)

19

20

21

22

23

24

25

Page 60

1

2                         CERTIFICATION

3

4    STATE OF FLORIDA:

5    COUNTY  OF  DADE:

6

7              I, Margaret Franzen, Shorthand Reporter

8    and  Notary  Public in  and for the State of Florida

9    at  Large,  do  hereby  certify  that  the  foregoing

10   proceedings  were  transcribed by me from an audio

11   recording held on the date and from the place as

12   stated in the caption hereto on Page 1 to the best of

13   my ability.

14              WITNESS  my  hand  this  19th day  of

15   August, 2015.

16

17

18         _____

                   Margaret Franzen
19           Court Reporter and Notary Public
           in and for the State of Florida at Large
20          My Commission Expires:  April 14, 2018

21

22

23

24

25